Filed 5/11/16 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>BRYCE WAYNE NICHOLES,<br><br>    Defendant and Appellant. | C077098<br><br>(Super. Ct. No. CRF120703)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Plaintiff and Respondent the People have filed a petition for rehearing with this court. It is ordered that the partially published opinion filed herein on April 20, 2016, be modified as follows:

1.     At page 15, in the first partial paragraph, delete the third full sentence that begins "His testimony," and replace it with the following:

> His testimony therefore suggests that the primary activities and predicate offenses he was testifying about were committed by members of one of the subsets he had identified as operating in Sutter County—Yuba City Norteños, Varrio Live Oak Norteños or East Morez.

1

There is no change in the judgment.  Respondent's petition for rehearing is denied.


BY THE COURT:


_____
RAYE, P. J.


_____
HULL, J.


_____
RENNER, J.

Filed 4/20/16 (unmodified version)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| THE PEOPLE, | C077098 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF120703) |
| v. | |
| BRYCE WAYNE NICHOLES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sutter County, Christopher R. Chandler, Judge. Affirmed as modified.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Robert Gezi and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

A jury acquitted defendant Bryce Wayne Nicholes of attempted murder, but found him guilty of the lesser included offense of attempted voluntary manslaughter (count 2). It also found him guilty of assault with a firearm (count 3), and found true allegations he

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part A, sections 1 and 2, of the discussion.

1

personally used a firearm and committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members. The trial court sentenced defendant to a total term of 17 years in prison: three years for the attempted voluntary manslaughter conviction; ten years for the gang enhancement on that crime; one year for the assault conviction; one year and four months for the firearm enhancement on that crime; and one year and eight months for the gang enhancement on that crime. The trial court also "stayed" a firearm enhancement of four years with respect to the attempted voluntary manslaughter conviction based on the imposition of the gang enhancement for that crime.

On appeal, defendant contends: (1) the trial court prejudicially erred by instructing the jury with CALCRIM No. 3471, regarding mutual combat or an initial aggressor, without also providing an optional portion of the instruction excusing an initial aggressor from withdrawing from a fight in which the victim of the aggressor's simple assault responds with a "sudden and deadly" counterattack; or (2) alternatively, he received ineffective assistance of counsel who failed to request this instruction; and (3) there was insufficient evidence that defendant's Oak Park subset of the Norteño gang qualifies as a criminal street gang for purposes of the gang enhancements.

We conclude that the instruction regarding an original aggressor's simple assault being met with deadly force from the victim is a special theory on which the trial court had no duty to instruct in the absence of a request. We also conclude that defendant's ineffective assistance of counsel claim fails because he cannot establish any prejudice. Accordingly, we affirm the judgment of conviction and the firearm use findings (Pen. Code, § 12022.5, subd. (a)).[1]

_____

[1] Undesignated statutory references are to the Penal Code.

We directed the parties to submit supplemental letter briefs on the effect of our Supreme Court's recent decision in *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*). In that case, our Supreme Court "decide[d] what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Id.* at p. 67.) The People contend that *Prunty* is inapplicable because the prosecution's theory was that the entire Norteño gang—not a specific subset—satisfied the definition of a criminal street gang. Alternatively, the People assert that the prosecution presented sufficient evidence of an associational or organizational connection among the Norteños, the Oak Park subset, and any applicable Sutter County subset(s). We disagree. The prosecution's theory and evidence in this case was not meaningfully different than the prosecution's theory and evidence in *Prunty*. Thus, there was insufficient evidence that defendant committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1).) Accordingly, we will modify defendant's sentence by striking the corresponding sentence enhancements. Because, however, the trial court stayed a four-year sentence on a separate firearm enhancement on the attempted voluntary manslaughter conviction only because of the gang enhancement it was imposing on that crime, we will also modify defendant's sentence by lifting the stay on that firearm enhancement.

## I. BACKGROUND

### A. *Self-Defense Claim*

In the early morning hours of January 29, 2012, defendant and at least one other individual were arguing on the dance floor at Big John's Bar and Grill in Yuba City, California. After a bouncer escorted them outside, defendant and Eric Baca continued to exchange words in the parking lot of the shopping center, located on Bridge Street and Oji Way.

3

The prosecution's theory and evidence presented at trial was that during the argument, defendant moved to his truck, then fired his gun into the air, and then fired again at a crowd of people, including Baca. Defendant then shot Michael Ybarra while defendant was driving his truck and Ybarra was running away.

It is undisputed that Baca incurred a nonfatal gunshot wound to his chest and Ybarra was struck by bullets in the arm and foot. Numerous eyewitnesses testified at trial. Because defendant's arguments on appeal require there to be substantial evidence that his use of deadly force was in response to a "sudden and deadly" counterattack, we need only summarize the eyewitness testimony that could be used to suggest this may have been the sequence of events. Even this select evidence produces contradictory versions of the events that led to the shooting of Baca and Ybarra:

Rodney Drumm testified at trial that on the night of the shooting he went to the bar at Big John's and followed people outside to the parking lot where four to five people were gathered around each other looking like they were "going to have a street fight." The people were "[t]hreatening each other back and forth who's going to whoop whose ass." The group proceeded towards a silver pickup. Drumm "saw a few people trying to get in the truck and all of a sudden a couple guns came out and bullets started flying." Drumm did not recall any shots fired into the air.

Detective Scotty Clinkenbeard of the Yuba City Police Department testified that he had interviewed Drumm about a week after the shooting. At that time, Drumm stated that a female got into the cab of the pickup through the driver's side rear door. A man standing at this door was the first person Drumm saw pull out a gun. According to the interview notes, Drumm said that individual pointed a black, semi-automatic handgun "up in the air" and fired two or three shots. Then, a shirtless man standing 10 feet behind the pickup pulled a handgun out from his waist area and started shooting at the driver's side. Two individuals at the pickup "returned fire:" "The guy standing at the back driver's door was shooting, and another guy from the passenger side came around the

4

back of the pickup truck with a handgun shooting at the no shirt guy." In total, three to four men and one woman left in the truck. Once the shooting stopped and the truck left, the shirtless man met up with another man in front of the bar. The two men walked toward Bridge Street raising their hands in the air in what appeared to be celebration. Eventually, Drumm saw a man in a gray t-shirt collapsed in the parking lot; the man had just been shot. Drumm stated he could not remember if the "victim"[2] had been involved in the shooting. Despite the fact that defendant relies on evidence of Drumm's interview, the parties agree that the evidence at trial established that the shirtless individual was Baca, and that Baca was on the ground in the parking lot when the police arrived.

Alana Hinojosa testified that she had accompanied defendant to Big John's, but stayed inside while he went out to smoke. Eventually, she followed a group of men who were rushing outside. There, she found defendant by himself facing a group of men by the front door. Michael Ybarra asked defendant where he was from. Hinojosa testified that she and defendant were "backing up" to the truck and more than four people followed them, including Baca and Ybarra, the latter of whom "showed his gun." Baca removed his shirt and took a wild swing at defendant that missed him entirely. Hinojsa testified that as she and defendant retreated, she repeatedly told the group of males in front of them to "back up" and not to "rush" her "baby's daddy." Meanwhile, she stayed between them and defendant. When she and defendant reached the pickup, Ybarra was at the driver's side headlight, Baca and two other individuals were at the back of the truck, defendant was at the driver's door, and she was at the rear door. Defendant fired one shot into the air "to get everybody back," then Michael Ybarra shot at defendant, and Hinojosa "just remember[s] all kinds of gunshots just going off." Defendant pushed her into the truck and drove away while the pickup "was getting shot from like every end, every end."

---

[2] In his interview, Drumm referred to a single gunshot victim.

Despite Hinojosa's testimony to the contrary, defendant does not dispute that he "may have fired a few gunshots out one of the truck's windows" and that Ybarra left the parking lot, bleeding, on foot.

## B.     Gang Enhancement

Section 186.22, also known as the Street Terrorism Enforcement and Prevention Act (the STEP Act), imposes an additional term of imprisonment on "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) For purposes of this sentence enhancement, a "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [the statute], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (*Id*., subd. (f).) A "pattern of criminal gang activity" is "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [certain] offenses [identified in the statute], provided at least one of these offenses occurred after the effective date of [the law] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (*Id*., subd. (e).)

The prosecution's gang expert, Michael Bullard from the Yuba City Police Department, testified that the "Nuestra Familia . . . is a prison gang that started and has control over the Norteño criminal street gang." He explained that "Norteños operate under a big umbrella so there's different gangs or levels of the gangs within them. So the Norteño being the big umbrella, the Norteño criminal street gang and there are subsets within that gang. . . ." The subsets include the Oak Park Norteños from Sacramento, and

6

the Yuba City Norteños, Varrio Live Oak Norteños and East Morez from in and around Sutter County.

Bullard opined that defendant was an active participant in the Norteño criminal street gang at the time of the shooting. Bullard's opinion was based in part on the fact that defendant had previously been documented to be an active participant in a subset from Oak Park in the Sacramento area. Bullard also opined that defendant committed the charged crimes for the benefit of or in association with the Norteño criminal street gang, and to further, promote or assist criminal conduct by the Norteño gang.

In response to the prosecution's attempt to elicit that there were at least three members of the relevant criminal street gang in the area, Bullard estimated that, at the time of the trial, there were approximately 250 Norteños in Sutter County. He also testified that Norteños use the color red and the number 14 to identify themselves. The prosecution asked Bullard, "as of January 2012 what was the primary activity of the Norteño criminal street gang *in our area*?" (Italics added.) In response, Bullard listed several crimes including murder, assault with a deadly weapon and robbery. He then testified as to predicate offenses involving members of "the Norteño criminal street gang" that he personally investigated.

## II. DISCUSSION

*A.    Jury Instructions Regarding Self-Defense*

The trial court instructed the jury using CALCRIM No. 3470 that defendant had a right to self-defense if he reasonably believed he was in imminent danger of suffering bodily injury, if he reasonably believed that the immediate use of force was necessary to defend himself, and if he used no more force than was reasonably necessary to defend against that danger.

CALCRIM No. 3471, as given to the jury in this case, provides: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

7

[¶] 1.  He actually and in good faith tried to stop fighting; [¶] AND [¶] 2.  He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight."

Defendant did not object to this instruction at trial.  The only error asserted by defendant is that the first part of one of the optional bracketed portions of CALCRIM No. 3471 should also have been provided:  "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force."  This bracketed portion continues, "and was not required to try to stop fighting (,/or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting]."  Defendant did not request that the trial court give any part of the bracketed portion of the instruction.

### 1.  *The Trial Court's Sua Sponte Duty to Instruct*

Defendant contends the trial court had a sua sponte duty to instruct the jury with the bracketed instruction.  We disagree.  " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.)  Nonetheless, "[a] court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial." (*People v. Ervin* (2000) 22 Cal.4th 48, 90.)  In particular, the trial court must include sua sponte instructions " 'on particular defenses and their relevance to the charged offense . . . if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People v.*

*Wickersham* (1982) 32 Cal.3d 307, 326, disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.)  But this duty is limited:  "The judge is required to instruct only on general principles that are necessary for the jury's understanding of the case; the judge need not instruct, without request, on specific points or special theories that might be applicable to the particular case."  (5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 677, p. 1044; see *People v. Garvin* (2003) 110 Cal.App.4th 484, 489.)  This rule applies to the situation at issue here.  (See *People v. Miceli* (1951) 101 Cal.App.2d 643, 648-649 [trial court has no sua sponte duty to provide instruction on "sudden and perilous" counter assault; "[t]he jury having been properly instructed on the law of self-defense, in the language of the code, the defendant should have proposed any amplification desired in a form that could be given"].)  Additionally, "the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly.  The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts." (*People v. Wade* (1959) 53 Cal.2d 322, 334, disapproved on another point in *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382.)

Defendant's reliance on *People v. Quach* (2004) 116 Cal.App.4th 294 (*Quach*) is misplaced.  *Quach* concerned possible mutual combat between rival gang members.  (*Id.* at pp. 297-298, 300-301.)  None of the eye witnesses stated that Quach was the first to draw his gun.  (*Id.* at pp. 297-298.)  The court instructed the jury with CALJIC No. 5.56 before it was amended to include optional language similar to the optional language in CALCRIM No. 3471.  (*Id.* at p. 300, fn. 2.)  The appellate court concluded that, given that they were "certainly the facts Quach argued," (*id.* at p. 302) the trial court should have instructed the jury on his right as an original aggressor to use self-defense in the face of a sudden and perilous counter assault by the victim without first needing to stop fighting or communicate a desire to stop fighting, "which would have helped the jury arrive at a verdict if they accepted that version of the facts."  (*Id.* at pp. 301, 302.)  The

9

court noted that the holdings that the bracketed instruction are based on "represent that exquisitely rare, tiny—but occasionally (very occasionally; once every 20 years) material[]—part of the law which was omitted from the instruction." (*Id*. at p. 302.)

This is not one of those cases. Defendant did not argue a self-defense theory based on an initial aggressor's right to respond to a sudden and perilous counter assault without needing to first withdraw or communicate a desire to withdraw from a fight. In fact, defense counsel argued to the jury that his client was not an initial aggressor at all: "Now, when we talk about initial aggressors such that you don't get to use self-defense, that's a person who lands a punch, who hits somebody, stabs somebody, shoots somebody and then tries to back off and claims self-defense. Words are not supposed to be a justification for attacking anybody at any time. Words are not a justification for that. You can call people anything you want. Words are not supposed to do that, and you cannot be called the initial aggressor because of the use of words." Further, defense counsel argued that his client never actually fought and communicated that he did not want to fight such that the bracketed portion of CALCRIM No. 3471 would have been unnecessary: "[W]hat we have is my client communicating by walking backwards, by saying back off which was heard by other people, by having his girlfriend intervene, by him again walking backwards and getting to the truck and firing a shot in the air communicating in a most effective way, other than writing these people, an act of Congress that I don't want to be involved in this. I don't want to be involved in a shooting, I don't want to be involved in your fight, I don't want to be mixed up with you guys, I want to get out of here."

Accordingly, defendant's theory that he was an initial aggressor entitled to self-defense because he was faced with sudden and perilous counter assault " 'was not one that the evidence would strongly illuminate and place before the trial court.' " (*People v. Davis* (2005) 36 Cal.4th 510, 570, quoting *People v. Wade, supra,* 53 Cal.2d at p. 335.) Even now, defendant seems uncertain how to argue that the facts viewed in the light most

10

favorable to him would justify the instruction he asserts the trial court had a sua sponte duty to give. Defendant claims, with no citation to the record, that "there was substantial evidence that appellant had *started the fight* with Baca and his group *or* become engaged in a mutual combat type situation, but used only non-deadly force, and that Ybarra *and/or* Baca responded with . . . sudden and deadly force." (Italics added) But he also contends that "instead of fighting," he went to his truck and, on the way, fired one or two shots into the air. There appears to be no evidence, let alone substantial evidence, that defendant committed a simple assault that is a necessary predicate for the bracketed instruction. (*People v. Hecker* (1895) 109 Cal. 451, 464; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 80, p. 522.) Assault with a firearm is not simple assault. (See *Williams v. Superior Court* (2001) 92 Cal.App.4th 612, 615, fn. 2 ["A violation of section 240 . . . is a simple assault. The additional element of 'use of force likely to create great bodily injury' under section 245, subdivision (a)(1) defines the felony of aggravated assault"].) And defendant offers no other facts to suggest he was an initial aggressor or committed a simple assault. In this situation, we conclude the instruction regarding an original aggressor's simple assault being met by deadly force from the victim is a special theory on which the trial court had no duty to instruct in the absence of a request.

There was no instructional error.

### 2. *Ineffective Assistance of Counsel Claim*

Alternatively, defendant contends that his trial counsel's failure to request the optional bracketed instruction was ineffective assistance of counsel. We disagree. "A defendant claiming ineffective assistance of counsel under the federal or state Constitution must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome." (*People v. Ochoa* (1998) 19 Cal.4th 353, 414; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-696 [104 S.Ct. 2052, 80 L.Ed.2d 674], superseded

11

by statute on other grounds.) Defendant's claim fails under both prongs. Again defendant fails to cite any evidence for his assertion that "the evidence indicated that appellant had started the fight with Baca and his group or become engaged in a mutual combat type situation, but had used only non-deadly force, and that Ybarra and/or Bacca responded so suddenly with deadly force by shooting at appellant that he did not have time to withdraw from the fight, thereby giving appellant a right of self-defense." If the most favorable version of the facts for defendant is credited, then, as his counsel argued at trial, he was not the original aggressor, and the entire instruction would not apply—particularly the need to excuse a failure to withdraw from a fight he did not participate in. Failing to request an optional instruction that is both unnecessary and that conflicts with defendant's theory of the case can hardly be considered unreasonable. For similar reasons, any request to include an unnecessary instruction would not have created a reasonable probability of a different outcome. Additionally, as the trial court correctly noted in denying a motion for new trial made based on the omission of the optional bracketed instruction, the facts did not support giving the instruction. There is no reason to believe the same request made during trial would have been resolved differently. As we have explained previously, there appears to be no evidence, let alone substantial evidence, that defendant committed a simple assault that is a necessary predicate for the bracketed instruction. Defendant's ineffective assistance of counsel claim fails because he cannot establish that his trial counsel was deficient under an objective standard of professional reasonableness or that without the alleged deficiency a different outcome was reasonably probable.

B.      *Evidence of a Criminal Street Gang*

*People v. Prunty* involved a similar challenge to the sufficiency of the prosecution's evidence to sustain a gang enhancement. (*Prunty*, *supra,* 62 Cal.4th at pp. 70-71.) The court held "that the STEP Act requires the prosecution to introduce evidence showing an associational or organizational connection that unites members of a putative

12

criminal street gang." (*Id*. at p. 67.)  And "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22[, subdivision] (f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets."  (*Id*. at p. 71.)

The STEP Act also "requires that the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22[, subdivision] (f), must be one and the same."  (*Id*. at pp. 75-76.)  The prosecution does not need to demonstrate the exact scope of the criminal street gang, but the jury must be able to infer that the gang the defendant sought to benefit included the group that committed the primary activities and predicate offenses under the STEP Act.  (*Id*. at p. 76.)  "And where, as in this case, the alleged perpetrators of the predicate crimes under section 186.22[, subdivision] (f) are members of particular subsets, the behavior of those subsets' members must connect them to the gang the defendant sought to benefit."  (*Id*. at p. 80.)

The evidence showed that Prunty identified as Norteño generally and that he claimed membership in a Detroit Boulevard subset.  (*Prunty*, *supra*, 62 Cal.4th at pp. 67, 68.)  "[T]he prosecution's gang expert testified about the Sacramento-area Norteño gang's general existence and origins, its use of shared signs, symbols, colors, and names, its primary activities, and the predicate activities of two local neighborhood subsets."  (*Id*. at p. 67.)  The expert also testified in support of the prosecution's theory that Prunty committed the charged assault with the intent to benefit the Sacramento-area Norteños. (*Id*. at pp. 67, 69.)  The court held that "where the prosecution's evidence fell short is with respect to the predicate offenses."  (*Id*. at p. 82.)  The prosecution introduced evidence of two predicate offenses involving three alleged Sacramento Norteño subsets— Varrio Gardenland Norteños, Del Paso Heights Norteños and Varrio Centro Norteños.

13

(*Ibid*.)  The prosecution's gang expert, Detective John Sample, characterized these groups as Norteños, but "he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang."  (*Ibid*.)  In particular, he "never addressed the Norteño gang's relationship to any of the subsets at issue. . . . Instead, Sample simply described the subsets by name, characterized them as Norteños, and testified as to the alleged predicate offenses."  (*Id*. at p. 83.)  While he testified that Norteño street gangs are associated with the Nuestra Familia prison gang, he did not testify about any relationship between any Nuestra Familia shot callers and any of the Sacramento-area Norteño subsets.  (*Ibid*.)  This testimony was insufficient "to permit the jury to infer that the organization, association, or group at issue included the subsets that committed the predicate offenses."  (*Id*. at p. 81.)

The People contend that *Prunty* has no effect on defendant's appeal because "the prosecution endeavored to prove that the Norteño gang—not a specific subset of the gang—met the statutory definition of a criminal street gang by introducing evidence of its primary activities and the requisite predicate offenses."  This argument is at odds with our Supreme Court's statement that it "granted review in [*Prunty*] to address the showing prosecutors must make when attempting to show that 'multiple subsets of the Norteños may be treated as a whole' under section 186.22[, subdivision] (f)."  (*Prunty*, *supra,* 62 Cal.4th at p. 71, fn. 2; see also *id*. at p. 70 ["We granted Prunty's petition for review to address the type of evidence required to support the prosecution's theory that various alleged gang subsets constitute a single 'criminal street gang' under section 186.22[, subdivision] (f)"].)

At defendant's trial, the prosecution's gang expert, Michael Bullard, testified that the Norteños are an umbrella organization and that "there's different gangs or levels of the gangs within them."  The evidence showed that defendant, like Prunty, was a member of the Norteños generally and a particular Norteño subset—here, the Oak Park Norteño subset from Sacramento.  The prosecution asked Bullard, "as of January 2012 what was

14

the primary activity of the Norteño criminal street gang *in our area*?" (Italics added.) After listing several crimes, Bullard testified as to two predicate offenses involving members of "the Norteño criminal street gang." Bullard, a narcotics and gang task force agent of the Yuba City Police Department, personally investigated both cases. His testimony therefore suggests that the primary activities and predicate offenses he was testifying about were committed by members of a subset from Sutter County. Regardless, there was no evidence from which the jury could infer that these offenses were committed by members of a subset in Oak Park in Sacramento County. Thus, *Prunty* controls this case because it "turns on the conduct of one or more gang subsets." (*Prunty*, *supra,* 62 Cal.4th at p. 67.) And this is critical because "[n]one of [the gang expert's] testimony indicated that any of the alleged subsets had shared information, defended the same turf, had members commonly present in the same vicinity, or otherwise behaved in a manner that permitted the inference of an associational or organizational connection among the subsets." (*Id*. at p. 82.)

Further, the STEP Act "requires the prosecution to show that a 'criminal street gang' exhibits some level of informal association among its members." (*Prunty*, *supra,* 62 Cal.4th. at p. 76.) It is clear from *Prunty* that sharing a common name, identifying symbols, enemy, ideology, and even self-identification are not sufficient to establish the existence of a criminal street gang. (*Id*. at pp. 74-75, 79, 82-84.) What is sufficient is more nuanced. Our Supreme Court provided "some illustrative examples of how the prosecution can show a criminal street gang to exist, particularly when the theory advanced is that various alleged gang subsets should in fact be treated as a single entity for purposes of the STEP Act." (*Id*. at p. 76.) The People emphasize a paragraph explaining that subsets can be treated as a single organization when they have an established certain details about their chain of command:

"The most straightforward cases might involve subsets connected through formal ways, such as shared bylaws or organizational arrangements. Evidence could be

15

presented, for instance, that such subsets are part of a loose approximation of a hierarchy. Even if the gang subsets do not have a formal relationship or interact with one another—indeed, even if they are unaware of one another's activities—the subsets may still be part of the same organization if they are controlled by the same locus or hub.  For example, Norteño gang subsets may be treated as a single organization if each subset contains a ' "shot caller[]" ' who 'answer[s] to a higher authority' in the Norteño chain of command."  (*Prunty*, *supra*, 62 Cal.4th at p. 77, quoting *People v. Williams* (2008) 167 Cal.App.4th 983, 988.)

Here, Bullard testified generally that Nuestra Familia "started and has control over the Norteño criminal street gang" and "there's a paramilitary type setup of the Norteño criminal street gang where they have what they call regiment commanders or they have a regimen [*sic*] set up."  But the illustrative examples and the paragraph relied upon by the People require, at a minimum, the prosecution to introduce evidence regarding the actual subsets at issue.  (See *Prunty*, *supra*, 62 Cal.4th at p. 83 ["[The gang expert] did not testify, for instance, about any relationship between Nuestra Familia shot callers and any of the Sacramento-area Norteño subsets"]; see also *id*. at pp. 77, 78 [explaining that "evidence that two seemingly unrelated Norteño cliques routinely act to protect the same territory or 'turf' could suggest that they are part of a larger association" and "evidence that two Norteño subsets have professed or exhibited loyalty to one another would be sufficient to show that the two subsets collaborate or cooperate"]; *id*. at p. 80 ["Evidence of self-identification must refer to the particular activities of subsets"].)  Indeed, in *People v. Williams*, general testimony regarding the larger group's hierarchy, including "shot callers," was insufficient where the evidence was not specific to the smaller group. (*People v. Williams*, *supra*, 167 Cal.App.4th at p. 988 ["Dilbeck's general references to 'shot callers' answering to a higher authority within the prison system were insufficient, absent any testimony that the group calling themselves the Small Town Peckerwoods

16

contained such a person, or that such a person was a liaison between, or authority figure within, both groups"].)

The People also rely on language from *Prunty* that states "[s]ubsets may also be linked together as a single 'criminal street gang' if their independent activities benefit the same (presumably higher ranking) individual or group. An example would be various Norteño subset gangs that share a cut of drug sale proceeds with *the same members of* the Nuestra Familia prison gang." (*Prunty*, *supra,* 62 Cal.4th at p. 77, italics added.) The evidence in this case does not satisfy this example either. Bullard explained that "[t]he Norteño criminal street gang *in general* pays tax." (Italics added) "[T]here's a paramilitary type setup of the Norteño criminal street gang where they have what they call regiment commanders or they have a regimen [*sic*] set up. So if you're conducting illicit activity in that business, you have to pay a specific percentage of your taxes to the regiment commander who in turn sends that money into the prison where members of the Nuestro Familia will get that money." Bullard gave no testimony regarding how the Oak Park subset actually operates, let alone which subset(s) committed the predicate offenses. (See *id.* at p. 81 ["in a case, like this one, where the prosecution's theory of a criminal street gang turns on the activities of two or more alleged gang subsets . . . the evidence the prosecution introduces to show an organizational or associational connection must be sufficient to show that the 'criminal street gang' at issue includes *those particular subsets*," (italics added)].) His testimony is thus insufficient to satisfy the requirements of *Prunty* and not meaningfully different from the expert testimony offered in that case.[3]

---

[3] This lack of proof is not surprising. At trial, the defense only disputed Bullard's opinion that defendant committed the alleged crime for the benefit of, at the direction of, or in association with the Norteños or its Oak Park subset. "The defense did not contest that the Norteños exist as an umbrella group that qualifies as a criminal street gang and operates through neighborhood subsets." (*Id.* at p. 93, fn. 3 (conc. & dis. opn. of Corrigan, J.).) Courts had also previously found expert testimony regarding Norteños sufficient. (See, e.g., *People v. Ortega* (2006) 145 Cal.App.4th 1344, 1356 ["Evidence

(See, e.g., *id.* at pp. 83-84 ["[The gang expert] testified extensively about 'the Norteños' . . . as to the group's size, its geographic location, and its general practices," and that " 'Norteño street gangs' are 'associate[d]' with the Nuestra Familia prison gang"].)

*Prunty* also instructs that we must decline the People's invitation to conclude that the jury could have inferred that the Oak Park subset of Sacramento County and the relevant Sutter County subset(s) have the requisite organizational connection where the gang expert did no more than characterize the relevant individuals as Norteños, explain that Norteños are associated with the Nuestra Familia prison gang, and give general testimony not linked to the particular subsets involved in this case. (*Prunty*, *supra,* 62 Cal.4th at pp. 82, 83 ["Contrary to the minority opinions' suggestions, we should neither speculate to fill evidentiary gaps [citation], nor defer to the jury's findings when there is no reasonable basis to do so [citations]"; "[The gang expert] did not testify, for instance, about any relationship between Nuestra Familia shot callers and any of the Sacramento-area Norteño subsets," or explain how those relationships connected with the predicate crimes committed by Sutter County subsets. "While he did reference 'written' and 'unwritten' rules that govern 'what gang members can and can't do,' he did not explain whether these rules applied to the particular subsets in this case"].)  At a minimum, *Prunty* requires that the prosecution, in a case involving Norteños and testimony that Norteños operate through subsets, introduce evidence specific to the subsets at issue. Here, the prosecution's evidence was insufficient to meet this requirement.

---

was thus presented, through the prosecution's gang expert, to establish every element of the existence of the Norteños as a criminal street gang"]; *id.* at pp. 1356-1357 ["We reject defendant's assertion that the prosecution had to prove precisely which subset was involved in the present case"]; *In re Jose P.* (2003) 106 Cal.App.4th 458, 467, 468 [rejecting defendant's argument that "the evidence of gang activity must be specific to a particular local street gang, not to the larger Norteño organization"].)

Accordingly, the additional terms of imprisonment imposed on defendant for the enhancements under the STEP Act (ten years as to the attempted voluntary manslaughter conviction and one year and eight months for the assault conviction) must be stricken. As we have noted, however, in addition to imposing an additional 11 years and eight months of imprisonment under the STEP Act (which now must be stricken), the court "stayed" a firearm enhancement of four years on the attempted voluntary manslaughter conviction based on the imposition of the gang enhancement for that crime. Because we now strike that gang enhancement, the reasons for the stay no longer exist, and we will modify defendant's sentence to lift the stay. Defendant's sentence will now be a total of nine years and four months in prison: three years for the attempted voluntary manslaughter conviction (count 2); four years for personally using a firearm in the commission of that crime; one year for the assault conviction (count 3); and one year and four months for personally using a firearm in the commission of that crime.

## III.  DISPOSITION

Defendant's sentence is modified by striking both of the enhancements under the STEP Act and by lifting the stay on the four-year sentence enhancement for use of a firearm on the attempted voluntary manslaughter conviction (count 2).  As modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and to forward that amended abstract to the Department of Corrections and Rehabilitation.

/S/

_____

RENNER, J.

We concur:

/S/

_____

RAYE, P. J.

/S/

_____

HULL, J.

20