Filed 1/5/21  P. v. Renteria CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CRISTIAN RENTERIA,<br><br>Defendant and Appellant. | F076973<br><br>(Super. Ct. No. VCF304654)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Darren K. Indermill, Lewis A. Martinez, and Cavan M. Cox II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

Cristian Renteria (defendant) stands convicted, following a jury trial, of two counts of shooting at an inhabited dwelling for the benefit of a criminal street gang, in the commission of which he personally used and intentionally discharged a firearm. (Pen. Code, §§ 186.22, subd. (b), 246, 12022.5, subd. (a), 12022.53, subd. (c); counts 1 & 2.)[1] He was sentenced to two consecutive terms of 23 years to life in prison, and ordered to pay various fees, fines, and assessments. On appeal, we hold: (1) Substantial evidence supports the gang enhancements; (2) Defendant has failed to establish ineffective assistance of counsel; and (3) Defendant is not entitled to a remand to present evidence and make a record of information relevant to his eventual youth offender parole hearing; but (4) The judgment must be modified to strike the section 12022.5 enhancements; and (5) Defendant is entitled to a remand to have the trial court exercise its discretion whether to strike the section 12022.53 enhancements. Accordingly, we affirm the judgment as modified and remand the matter to the trial court to exercise its discretion.

## FACTS[2]

### *The Charged Offenses*

James V. resided on Denair Street, between Woodward and Merritt Avenues, in Tulare. On the evening of August 7, he was in the driveway of his house when he heard what sounded like fireworks. He saw a flash near the corner of Woodward and Denair. According to his trial testimony, he then saw a person walking south, away from the area

---

**1**     All statutory references are to the Penal Code.

The jury acquitted defendant of discharging a firearm with gross negligence for the benefit of a criminal street gang. (§§ 186.22, subd. (b), 246.3, subd. (a); count 3.)

**2**     Unless otherwise specified, dates in the statement of facts are from the year 2014. The events of August 7 gave rise to count 3. The events of August 8 gave rise to counts 1 and 2.

Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

2.

of the flash, but could not tell if that person was a male or a female. Because he thought a shooting might have occurred, James called the police.

Tulare Police Officer Wilson was dispatched to the area at approximately 8:58 p.m. He found six .22-caliber brass shell casings, all Remington brand, within a 10-foot cluster near a vehicle that was parked on the west side of Denair.

Wilson spoke with James at the scene. James reported he had heard what sounded like a "pop shot." When he looked in the direction of the sound, he heard five more gunshots from a pistol. James said he saw a Hispanic male, approximately five feet seven inches tall and 160 pounds, wearing a long white T-shirt and blue jeans. This person was kneeling behind the parked vehicle and firing a pistol northward. The person got up, walked quickly southbound, and then ran westbound on Woodward.

As of August 8, Anthony A. resided on Merritt, near where Denair dead ends at Merritt and by a vacant field. Not long before 10:00 or 10:30 that night, Anthony was inside when his wife and children told him there were some youngsters outside. Anthony went outside to see who it was and to talk to them. He was tired of things that were happening in the neighborhood, and he wanted to tell them that he did not want it ever happening at his house.

Once outside, Anthony saw at least five or six young male adults just past his house, heading toward the field. Some were hollering "SUR, trece." One young man — defendant — recognized Anthony. He and Anthony lived a few houses away from each other. Every time Anthony and his wife passed defendant's house when going to the store, defendant would greet them respectfully. This night, when defendant recognized Anthony, defendant "took a different tone" and spoke respectfully to Anthony. He explained that a couple of the "young adult – young boys" were drunk, and the group was trying to help them get home. Anthony said okay and that he did not want any problems and for them to get home safely and have a good night. He then went back inside.

3.

A little while later, Anthony heard a sound like a "pop" in the field. He went outside and sat on his front porch, waiting to see if anybody would come back, so he could ask them what was going on. Defendant and one other person returned. They came from the field area, walked west on Merritt, and then began walking south on Denair, on the east side of the street. Anthony lost sight of them for a couple of minutes, then saw them walking north on Denair, on the west side of the street. They stopped near the north side of Merritt, at the intersection with Denair. Jack D. lived in the house just north of where they stopped, which was two houses west of Anthony's home. Harvey D., an older Black man, lived in the house between Anthony and Jack.

Defendant and his companion both went almost across the intersection to the north side. Both stepped up. Defendant had a small metal object in his hand. He lifted it up and started shooting at Jack's house. He fired four or five times. Two dogs at Harvey's house were barking. Defendant moved to get in front of that house, fired toward it a couple times, returned to Jack's house and "unloaded the clip," and then he and his companion ran south on Denair. Anthony went inside and called 911.

Just before the shooting started, one of Harvey's sons had closed the garage door and gone inside. Harvey's cousin, who was in the living room, heard four gunshots and then three later on. One bullet struck the television in the living room, and went through the wall and into the bedroom beyond.

Jack's grandchildren, including grandson's S.D. and B.D., resided in his home with him and his wife. Jack did not see the shooting occur, but there was damage near his doorbell that he had not seen before the police pointed it out to him. Jack was familiar with the terms "Norte[ñ]o" and "Northerners," which he thought had to do with gangs. To his knowledge, no one in his family was involved in gang activity.

Tulare Police Officer Sunderland responded to the area at approximately 11:50 p.m. on August 8. He spoke to Anthony, then went to Jack's house. Concerned about the welfare of the occupants, he banged on the front door and the garage door, but

received no response. Because there were a number of bullet holes in the garage door and the stucco above it, Sunderland opened the garage door. No one was present, but Sunderland noticed a sawed-off shotgun inside the garage. Sunderland then went next door and spoke to Harvey's son. Harvey's son drew Sunderland's attention to two bullet holes in the front screen door and damage inside the house.

Sunderland found two Remington .22-caliber, brass-colored shell casings at the southeast corner of Merritt and Denair. Another police officer found two expended .22-caliber brass shell casings in the intersection of Merritt and Denair. Subsequent testing showed the shell casings recovered on August 7 and August 8 all were fired from the same firearm.

At the time of the shootings, Tulare Police Officer Adney was a detective in the gang unit. He responded to the August 8 call and spoke with Anthony, and had him point out the house where he believed the shooter lived. Anthony pointed to a residence on Olympia. Adney personally had investigated incidents involving that residence, and had personal knowledge defendant lived there. The residence was a known Sureño residence.

Adney created a photographic lineup that contained defendant's photograph. When shown the lineup later on the night of the shooting, Anthony identified defendant's photograph.

The next day, Adney went to Jack D.'s residence. B.D. was outside. When Adney approached, B.D. quickly went inside. Adney knocked on the door, but no one answered initially. He kept knocking, and eventually B.D. came to the door. B.D. was not cooperative.

Upon learning shots were fired in the area on August 7, Adney contacted James, who agreed to look at a photographic lineup. Adney administered the standard admonition, then asked if James recognized anyone in the lineup that he had seen on the

night of the incident. James pointed to defendant's photograph and said he was 40 percent sure.[3]

Defendant was arrested on August 13. While seated in Adney's vehicle, he asked to speak to Adney. He was advised of, and waived, his constitutional rights. During this interview (an audio recording of which was played for the jury), defendant said that on the night of the shootings at Merritt and Denair, he was with his girlfriend, Monica L., and their baby. He was there for several hours in the afternoon, then returned to his father's house on West Alpine, where he stayed for the rest of the night.[4] He denied being involved in shooting at a house. Eventually, he said he "got hit up" and heard a noise like a shotgun, and he ran. This happened on West Street, which Adney estimated was about a quarter of a mile from Denair. Defendant agreed when Adney said that in the gang life, a person is not allowed to be a victim, but has to retaliate and do it himself. Defendant said, however, that he was his own person and would not let someone tell him what to do.

Defendant said it was getting dark when the gun was pulled on him. He felt scared and "kind of pissed." He guessed they were Northerners. They asked where he was from. He did not tell them " 'South Side Kings' "; when they asked him, that was when he heard the noise and ran.

---

[3]     James testified at trial that he did not recognize anyone, but selected a photograph he thought might have shown the perpetrator. The officer who showed him the photographs told him to take a guess, and he did. Adney denied telling James to take a guess or pressuring him to make a selection.

[4]     Defendant said Monica lived on O Street, which, according to Adney, was on the east side of town, while Merritt and Denair were on the far northwest side. Adney determined Monica actually lived on Woodward, a few houses west of Denair and one block south of Merritt.

Defendant consented to a search of his father's residence. No firearms were located; however, a blue container with "SUR" written on it was found. Monica's residence also was searched. No firearm was found.

Defendant was taken to the police department and booked. Adney and Detective Guerrero conducted a second interview with him (an audio-video recording of which was played for the jury), at the outset of which defendant was again advised of, and waived, his rights. Defendant admitted being a Southerner and being "Kings." He said he had been a member for a couple of years, and had been jumped in. He explained that he was jumped in for 13 seconds, because "M" was the 13th letter of the alphabet and "M" stood for Mexican Mafia. Asked what the Mexican Mafia had to do with Sureños, defendant replied, "All I know is that we just get along 'em [*sic*]."

When shown photographs of the houses that were struck by gunfire, defendant said he had seen "some Black people" around one of them, but that was all he knew. He denied hearing the noise that sounded like a shotgun at the other of the two houses. He said there were a lot of people who knew him "out there" that did not like him, because he associated with southsiders.

### *The Gang Evidence*

Sunderland arrested defendant in October 2008 at a middle school in Tulare. Sunderland was called to the school in response to a student who had brought a knife onto campus. The assistant principal showed Sunderland a blue bandana and a blue razor blade knife. After Sunderland advised defendant of his constitutional rights, defendant said he was scared and had brought the knife to school for protection. Defendant initially denied being a southern gang member, but then admitted he had been one for about a year.

On June 25, 2011, Tulare Police Officer Robertson responded to a residence in Tulare in response to a trespassing report. When he and another officer arrived, they noticed the front door to the residence was open. Robertson found defendant and

7.

Edwin C. in back, just outside the house. Edwin was holding a can of blue spray paint. Both cooperated when Robertson escorted them to the front of the house, but defendant pulled away when Robertson started to handcuff him and said he was not going to go to jail. Robertson was able to restrain him. Robertson saw fresh blue spray paint on the back of the house and throughout the residence. Among the graffiti were "SSK," "Chap KILLA," "X3," and "KIXGS." At the time, defendant lived on Olympia Avenue.

In addition to testifying concerning his investigation into the charged offenses, Adney testified as a gang expert. He explained that under the Penal Code, a gang is any ongoing association, organization, or group of three or more people having a common name and identifying marks or symbols, and who actively participate in criminal activity. To join a gang, people used to get jumped in, i.e., they fought multiple gang members for a certain length of time. More recently, people get "crimed in," meaning they "put in work" — commit crimes for the benefit of the gang.

According to Adney, "[r]espect is everything" in the gang culture, and is the "hallmark" of the Sureño gang. A person can gain respect by putting in work for the gang, not being a coward, and committing crimes of opportunity or any type of crime that will benefit the gang as a whole, whether against rival gang members or people in the community. Typically, the more violent someone is, the more respected that person is. A person gains respect through fear and intimidation, both by being feared by the community and by being feared by one's own gang members because of the work the person puts in for the gang. Gang members sometimes utter gang slurs while committing crimes. A gang slur can be any type of statement to let other people know who is responsible for the crime.

Adney explained that there are rules for gang members. Southerners are "pretty much" street-level affiliates of the Mexican Mafia, so they follow the same rules. One rule is to not be a coward. Another is to not be an informant for law enforcement. A member's violation of the gang's rules can be considered an act of treason, and can result

8.

in punishment, assault, or being killed.  If a gang member is a victim of a crime, a response is required.  Reporting it or talking to the police can result in the gang member being deemed an informant.  The person is expected to retaliate, because his respect is everything to him.  If the gang member does not try to get revenge or payback, he loses all respect that he has from his gang, and he does nothing for the gang as a whole.

Adney opined that a crime committed by a gang member can benefit or promote a gang even if the victim is not a rival gang member.  Gang crimes — particularly violent ones — are in the news and on social media.  Because of fear and intimidation, members of the community often are reluctant to cooperate with law enforcement in the investigation of gang crimes.  The intimidation of witnesses or the community as a whole increases the gang's control over its territory, and makes it less likely for witnesses to come forward and cooperate in the investigation of gang crimes.  Adney had personal experiences with witnesses' houses being shot at, their property vandalized, and the witnesses being threatened and assaulted.

Adney had training regarding, and personal experience investigating crimes involving, the Sureño gang, and had had personal contact with members of that gang.  He explained that in the mid-1980's or early 1990's some families that were part of the Latin Times in Los Angeles moved to Tulare County.  When they came to Tulare County, they had a feud with Northerners, and started consolidating gangs — one of which was the South Side Kings — into a single gang.  As of the time of trial, Adney estimated there were no less than 500 members of the Sureño gang in Tulare County.

Adney explained that the Sureño gang has a structure or hierarchy.  The gang identifies with the color blue and number 13.  The number 13 is used because "M" is the 13th letter of the alphabet.  It represents the Mexican Mafia.  "X3" is a way of representing the number 13.  The word "SUR" is Spanish for south, while the word "trece" is Spanish for 13.

9.

The rivals of the Sureño gang are the Norteño gang, and there is a history of violence between the two groups. Sureño gang members use the derogatory terms "busters" and "chaps" to refer to Norteños. "Sureño" means Southerner, while "Norteño" means Northerner. Sureños sometimes refer to themselves as Southerners, while Norteños sometimes refer to themselves as Northerners. Norteños identify with the color red and number 14. "N" is the 14th letter of the alphabet, and signifies Nuestra Familia.

Adney explained that graffiti can be a way of gangs identifying their turf or territory. Some turf is contested, meaning it is claimed by both gangs. This can happen when Northerners and Southerners live in the same neighborhood, and typically means there are more problems in that neighborhood. The neighborhood in which the charged shootings occurred was contested territory in 2014.

Adney gave examples of persons who committed crimes for the Sureño gang. One was Francisco Cortez. On April 10, 2014, Adney and Guerrero were on duty in Tulare when they saw a vehicle travel through several intersections and into an alleyway. There, the car came to an abrupt stop and two subjects got out. A loaded magazine fell from one of them. One subject was detained. The other — Cortez — dropped a gun as he ran. He was also apprehended. Cortez and the vehicle's other occupants were all Sureño gang members. Cortez was convicted of criminal possession of a firearm, a felony, with a gang enhancement as a result of the incident. In Adney's opinion, the crime fit the pattern of criminal activity that Sureño gang members have engaged in in Tulare County.

A second example was Fabio Delreal. On June 12, 2014, Adney and Guerrero were on duty in Tulare when they observed a vehicle occupied by Delreal, a known Sureño gang member. A parole search was conducted of his person and vehicle, and a loaded, stolen firearm was found inside the vehicle. Delreal was convicted of a felony with a gang enhancement as a result. In Adney's opinion, the crime fit the pattern of criminal activity that Sureño gang members have engaged in in Tulare County.

10.

A third example was Armando Flores.  On February 4, 2009, shots were fired from a passing vehicle at a vehicle that was backing out of a residential driveway.  When the suspect vehicle was located several days later, it was occupied by Flores and Daniel Villa Gomez, both of whom were Sureño gang members.  Two firearms were located in the vehicle.  Gomez admitted being the driver and identified Flores as the shooter.  Each was convicted of a felony with a gang enhancement as a result.  In Adney's opinion, the crimes fit the pattern of criminal activity that Sureño gang members have engaged in in Tulare County.

Adney explained that the Sureño gang has cliques or subsets of which South Side Kings is one.  All identify with the color blue and the number 13, and all have Norteños as their common enemy.  The subsets are united by an organizational or associational connection.  They share information and work together.  They share weapons with each other.  Adney personally had investigated cases in which different subsets of the Sureño gang in Tulare County worked together as a single organization to commit crimes.

Adney investigated defendant to determine whether he was involved with any gang.  Adney used a 10-criteria system to validate someone.  The person must meet three of the criteria, unless he admits gang membership after being taken into custody.

With respect to Sunderland's contact with defendant at school, it was significant that defendant possessed a blue bandana.  Anyone with knowledge of gangs would know this was an indication he was part of the Sureño gang.  It also enhanced his reputation by showing he was bold enough to wear the gang's colors, knowing that rival gang members could assault him for it.  As for the knife, gang members arm themselves for crimes of opportunity, either in coming across rival gang members or being disrespected or challenged by a nongang member.

With respect to the 2011 vandalism case, "SSK" was an acronym for South Side Kings, a Sureño gang of which defendant was a part.  "Chap killer" basically meant Norteño killer.  "KIXGS" was typical with the Sureño gang, as its members will

11.

substitute something for the letter "N." "X3" represented the number 13. Adney was familiar with Edwin C.; he was a member of the Sureño gang and of the South Side Kings. There were also other incidents on which Adney based his opinion concerning defendant.

Based on his knowledge, training, experience, and investigation of the current case and defendant, Adney opined that on August 7 and 8, defendant was a member of the Sureño gang.

Prior to the shooting of August 8, Adney was familiar with some of Jack D.'s relatives who lived at or were associated with Jack's house on Merritt Avenue. In particular, he was familiar with Jack's two grandsons, one of whom was at the house when Adney went there the day after the shooting. Adney had had personal contact with the grandsons, both in his capacity as a gang detective and while he was a patrol officer prior to his gang assignment. The majority of Adney's contacts at the house were with two other subjects, R.P., Jr., and R.P., Sr., whom he knew were associated with Jack's residence. Adney personally had seen R.P., Jr., associating with Norteño gang members.

Adney was asked to assume the following hypothetical facts were true: A witness observes several individuals near his house late at night. He hears one or more call out "SUR trece." After a few minutes, one of them comes back, produces a firearm, and shoots at two houses. The second house is shot at after dogs on the property start barking. A sawed-off shotgun is seen in the garage of the first house. The area is claimed by both Norteño and Sureño gangs. The shooter is a member of the Sureño gang. Earlier that night, he was "hit up" by some individuals as he was walking home, and the Norteño gang members pulled a gun on him.

Based on the hypothetical facts, Adney opined this was a gang shooting. It benefited the Sureño gang in a variety of ways, whether the victim was a rival gang member or a regular citizen. It showed the perpetrator was willing to put in work for the gang and to be violent. "SUR trece" let everyone know who was responsible. The

12.

shooter would elevate his status within the gang, and also elevate the status of the gang as a whole by creating fear and intimidating the victims, anyone who observed the shooting, and anyone who lived in the neighborhood. This in turn would make people reluctant to talk to the police, resulting in suspects not getting arrested and cases not getting solved. This would allow gang members to carry on their daily gang activities, whether in this or a new neighborhood. A shooting under the circumstances of the hypothetical would bolster the Sureño gang's reputation for violence, elevate the shooter's status within his own gang, and garner respect for other Sureño gang members.

It was significant to Adney that when the shooter was "hit up" — challenged or shown disrespect in such a way that the recipient would be expected to respond — earlier, he believed Norteños were the ones who pulled a gun on him. It showed the person was not a coward and was not showing weakness. In the gang context, being asked where a person is from means what gang they are a part of. It is very disrespectful for a gang member to be hit up and challenged as to where he is from.

## DISCUSSION

### I

### SUFFICIENCY OF THE EVIDENCE

Defendant contends the evidence is insufficient to sustain the true findings on the gang enhancements. We disagree.

### A. General Legal Principles

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the

13.

trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies equally to convictions and enhancement allegations (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1197, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Garcia* (2014) 224 Cal.App.4th 519, 522-523).

**B.     The Two Prongs of the Gang Enhancements**

The gang enhancements required proof defendant committed the substantive offenses (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1), (4).) Defendant says neither prong was shown by substantial evidence. We disagree.

1. *Benefit, direction, or association*

"[T]he Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment . . . only if the crime is "gang related." ' [Citation.] Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) A crime *is* gang related, however, if, inter alia, it is committed in association with the gang, or it is committed for the benefit of the gang. (*Ibid*.) Thus, if the crimes were committed for the

benefit of a criminal street gang, they need not also have been committed in association with the gang.  (See *People v. Garcia* (2017) 9 Cal.App.5th 364, 379; *People v. Weddington* (2016) 246 Cal.App.4th 468, 484.)

Adney testified concerning how the charged crimes benefited the Sureño criminal street gang, even if they were not committed against rival gang members.  Moreover, there was evidence Jack D.'s house had at least some link to Norteños, even if it was not a hotbed of rival gang activity.  The neighborhood was contested territory, and Anthony testified he was tired of "issues" happening around the neighborhood and did not "want that happening ever on [his] house."  Defendant told Adney he had been "hit up" by people he thought were Northerners.  Although he said this happened at a different location, jurors reasonably could have inferred, in light of the sawed-off shotgun in Jack D.'s garage, the fact defendant lied about where Monica lived, and the fact defendant was not likely to want to place himself at the scene of a shooting, that he lied.  Viewed as a whole, the evidence was sufficient to establish the first prong of the gang enhancement. (See *Albillar*, *supra*, 51 Cal.4th at p. 63; *People v. Pettie* (2017) 16 Cal.App.5th 23, 51.)

2. *Intent*

With regard to the second prong, section 186.22, subdivision (b)(1) requires the specific intent to promote, further, or assist in *any* criminal conduct by gang members — including the current offenses — and not merely *other* criminal conduct by gang members.  (*Albillar*, *supra*, 51 Cal.4th at p. 65.)  In *People v. Rios* (2013) 222 Cal.App.4th 542, the appellate court essentially limited *Albillar*'s holding in this regard to cases where the defendant acted in concert with others.  The court stated:  "[W]here the defendant acts alone, the combination of the charged offense and gang membership alone is insufficient to support an inference on the specific intent prong of the gang enhancement.  Otherwise, the gang enhancement would be used merely to punish gang membership."  (*People v. Rios*, *supra*, at pp. 573-574.)  Clearly, however, section 186.22, subdivision (b) applies to lone actors.  (See *People v. Rios*, *supra*, at p. 546; see also

15.

*People v. McDonald* (2015) 238 Cal.App.4th 16, 39-40.) In *People v. Hill* (2006) 142 Cal.App.4th 770, the Court of Appeal reasoned: "[T]he specific intent required by the statute is 'to promote, further, or assist in *any* criminal conduct by gang members.' [Citation.] Therefore, defendant's own criminal threat qualified as the gang-related criminal activity. No further evidence on this element was necessary." (*Id*. at p. 774.)

It is not altogether certain defendant acted alone. Even if he did, however, the evidence went well beyond the mere combination of the charged offenses and gang membership. (Cf. *People v. Rios*, *supra*, 222 Cal.App.4th at p. 573 [only facts prosecution asked expert to consider in hypothetical were (1) person was gang member and (2) he possessed gun].) Adney testified to the importance of respect in gang culture and to Sureños in particular. He explained that if a Sureño is a victim of a crime or is shown disrespect, a response is required. Showing one is willing to put in work for the gang and be violent elevates that person's status within the gang and the status of the gang as a whole. Intimidation of witnesses and the community increases the gang's control of territory.

"A reasonable jury could infer, based on this testimony and other evidence in the record, that [defendant] intended for the [shooting at Jack D.'s house] to have the predicted effect of intimidating rival gang members and neighborhood residents, thus facilitating future crimes committed by himself and his fellow gang members." (*People v. Vazquez* (2009) 178 Cal.App.4th 347, 353.) Jurors reasonably could also have inferred defendant intended (1) the shooting at Jack D.'s house as retaliation for getting "hit up" earlier, and so as a means of recouping respect for himself and for the Sureño gang, and (2) the shooting at Harvey's house as a means of intimidating possible witnesses, and to quiet the dogs and facilitate his escape, thereby furthering his gang's reputation and control of contested territory, and his own gang-motivated criminal conduct. As such, the evidence was sufficient to establish the second prong of the gang enhancement.

## C.  The Existence of a Criminal Street Gang

This should, but does not, end our analysis.[5]  Although not raised by the parties, this court invited them to address the issue of whether the evidence was sufficient under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*).  We conclude that it was.

In his supplemental briefing, defendant asserts the evidence failed to show the group he acted to benefit, the group that committed the predicate offenses, and the group whose primary activities were introduced were one in the same.  Defendant points to evidence he "admitted he belonged to 'SSK,' " which was "identified as a Sure[ñ]o gang subset," and to evidence the predicate acts were committed by Sureño gang members.  He argues there needed to be testimony connecting the Sureños to the SSK.  The Attorney General responds that the evidence was sufficient because it showed defendant was a member of the Sureño criminal street gang, his actions benefited the Sureño criminal street gang, and the predicate acts were committed by Sureños.  We agree with the Attorney General.  Since the prosecution's theory of why a criminal street gang exists did not turn on the conduct of one or more gang subsets, the requirements of *Prunty* do not apply.

As part of proof of the gang enhancement, the prosecution must prove the existence of a criminal street gang.  The Street Terrorism Enforcement and Prevention Act (the STEP Act) "defines 'criminal street gang' as any ongoing association that

---

**5**  Recently, Justice Ruth Bader Ginsburg explained the principle of party presentation.  "In our adversarial system of adjudication, we follow the principle of party presentation . . . [citation], 'in both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.' [Citation.]  In criminal cases, departures from the party presentation principle have usually occurred 'to protect a *pro se* litigant's rights.' [Citations.]  But as a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.' [Citation.]" (*United States v. Sineneng-Smith* (2020) 590 U.S. ___, ___ [140 S.Ct. 1575, 1579], fn. omitted.)

17.

consists of three or more persons, that has a common name or common identifying sign or symbol, that has as one of its 'primary activities' the commission of certain specified criminal offenses, and that engages through its members in a 'pattern of criminal gang activity.' ([§ 186.22], subd. (f), italics [omitted].) A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' specified criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' (*Id.*, subd. (e).)" (*People v. Loeun* (1997) 17 Cal.4th 1, 4.) "Thus, for a group to fall within the statutory definition of a 'criminal street gang,' these requirements must be met: (1) the group must be an ongoing association of three or more persons sharing a common name or common identifying sign or symbol; (2) one of the group's primary activities must be the commission of one of the specified predicate offenses; and (3) the group's members must 'engage in or have engaged in a pattern of criminal gang activity.' [Citations.]" (*Id.* at p. 8.) A pattern of criminal gang activity can be proven, inter alia, through evidence of the charged offense and another offense committed on a prior occasion by the defendant's fellow gang member. (*People v. Gardeley* (1996) 14 Cal.4th 605, 625, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.)

*If* the prosecution's theory of why a criminal street gang exists turns on the existence and conduct of one or more gang subsets — for example, when "the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets" — then the prosecution must prove an associational or organizational connection between the gang and the subsets. (*Prunty*, *supra*, 62 Cal.4th at pp. 67-68.)[6]

---

[6] There was testimony describing the structure of the gang as a county-level gang that had subsets. Asked about the history of the Sureño gang in Tulare County, Adney explained that when certain families moved from Los Angeles to Tulare County, they

Prunty was charged with attempted murder and assault with a firearm. To prove each offense was subject to a gang enhancement under section 186.22, subdivision (b), the prosecution introduced evidence that Prunty admitted he was a Norteño gang member and held membership in the Detroit Boulevard Norteño " 'set.' " Prunty's clothing, previous contacts with law enforcement, and possession of Norteño graffiti and other paraphernalia were consistent with Norteño gang membership. (*Prunty*, *supra*, 62 Cal.4th at p. 68.) Prunty's companion in the crimes was a member of the Varrio Franklin Boulevard Norteños. (*Ibid*.) With respect to the prosecution's theory Prunty committed the charged offenses with the intent to benefit the Norteños, evidence was presented concerning Norteños in general, and that Norteños in Sacramento (the relevant

---

started consolidating the local gangs — one of which was SSK — into a single gang. Adney did name cliques of the Sureño gang in Tulare County. Additionally, although unnecessary given the prosecution's theory, Adney was asked leading questions about whether the cliques were united by an organizational or associational connection, worked together, shared information with each other, and shared weapons with each other to which he gave conclusory answers. "In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang." (*Prunty*, *supra*, 62 Cal.4th at pp. 78-79.) Adney's conclusory testimony in this regard does not constitute substantial evidence, because it lacks an adequate foundation. An expert's opinion " 'may not be based "on assumptions of fact without evidentiary support . . . ." ' [Citation.]" (*People v. Flores* (2020) 9 Cal.5th 371, 398; see *In re Alexander L.* (2007) 149 Cal.App.4th 605, 612.) Adney also testified, however, that he personally had investigated cases in which different subsets of the Sureño gang in Tulare County had worked together as a single organization to commit crimes. This testimony, based as it was on Adney's own investigations, neither constituted opinion testimony nor lacked foundation.

The concurring and dissenting opinion says that, given Adney's testimony the county-level Sureño gang operated through subsets, *Prunty* required the prosecution to show a connection between the Sureño gang and its subsets, or among the subsets, beyond Adney's testimony. (Conc. & dis. opn. of Smith, J., *post*, pp. 19-20.) We do not read *Prunty* to reach so broadly. The mere existence of such evidence does not, and did not in this case, demonstrate that the prosecution's theory of why a criminal street gang exists turned on the existence and conduct of one or more gang subsets.

19.

geographical area) were not associated with any particular " 'turf,' " but were found all over Sacramento with a lot of subsets based on different neighborhoods. (*Id.* at p. 69.) To prove the Sacramento-area Norteños engaged in a pattern of criminal gang activity, the prosecution presented evidence of predicate offenses. One offense was shown to have been committed by two members of the Varrio Gardenland Norteños. Another was shown to have been committed by a member of the Varrio Centro Norteños. Aside from testimony that the Varrio Gardenland Norteños and the Varrio Centro Norteños referred to themselves as Norteños, the prosecution produced no specific evidence showing they identified with a larger Norteño group, or that they shared a connection with each other or with the two Norteño-identified subsets to which Prunty and his companion associated. (*Id.* at pp. 82-83.)

Our Supreme Court did not find an issue with Prunty self-identifying as both a member of the Detroit Boulevard Norteños and the larger umbrella Norteño gang. (*Prunty*, *supra*, 62 Cal.4th at p. 82.) "[W]here the prosecution's evidence fell short [was] with respect to the predicate offenses." (*Ibid.*) The perpetrators of the predicate offenses were identified as members of three Norteño subsets. (*Ibid.*)

The difference between how the prosecution sought to prove the existence of a criminal street gang in *Prunty* and how the prosecution proved the existence of a criminal street gang in defendant's case is readily apparent. Here, the evidence showed defendant identified as a member of the SSK subset of the Sureños and also as a Sureño. Although, it is clear SSK was not shown to be a criminal street gang, as defined by the STEP Act, in its own right,[7] the prosecution's theory — and the evidence presented — was that the gang defendant acted to benefit, was the same gang to whom the perpetrators of the

---

[7] Although we can surmise SSK was an ongoing association of three or more persons who shared a common name or identifying sign or symbol, no evidence was presented as to the group's primary activities or that the group's members engaged in a pattern of criminal gang activity.

20.

predicate acts belonged.  (*Prunty*, *supra*, 62 Cal.4th at p. 76.)  The gang slur shouted a short time before the shootings was "SUR trece," not merely "SSK" or a slur specific to a subset.  The predicate acts were committed by Sureños, and the primary activities of the Sureño criminal street gang in Tulare County were those committed as the predicate acts.  Nothing in *Prunty* precludes a prosecutor from relying on a broader group such as the Sureños as the relevant criminal street gang.  (See *People v. Pettie*, *supra*, 16 Cal.App.5th at p. 49.)

In addition to incorrectly finding *Prunty* was violated, the concurring and dissenting opinion finds insufficient evidence of the primary activities element of the statutory definition of a criminal street gang.  However, neither party raised this issue, nor was that issue in this court's request for supplemental briefing.  That request read, in pertinent part:  "The parties have briefed the issue of sufficiency of the evidence underlying the gang enhancements imposed in this case . . . .  The parties are hereby notified that they may file a supplemental brief addressing whether the evidence underlying the gang enhancements is sufficient under *People v. Prunty* (2015) 62 Cal.4th 59."  The primary activities discussion in the concurring and dissenting opinion is set apart by a separate heading and does not discuss *Prunty*.  Again, the principle of party presentation has been contravened.  " '[C]ourts are essentially passive instruments of government.'  [Citation.]  They 'do not, or should not, sally forth each day looking for wrongs to right.  [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties.'  [Citation.]"  (*United States v. Sineneng-Smith*, *supra*, 590 U.S. at p. ___ [140 S.Ct. 1575, 1579].)

The concurring and dissenting justice appears to take the position that if a party claims evidence is insufficient to support a conviction or enhancement because it fails to establish one of multiple elements thereof, a reviewing court is free to reverse a judgment based on deficiencies in the evidence regarding a separate and distinct element, regardless of whether the opposing party has been given an opportunity to address the

21.

precise matter. (Conc. & dis. opn. of Smith, J., *post*, p. 6.) Not surprisingly, the concurring and dissenting opinion cites no authority for such a startling proposition. In its quest to find grounds for reversal, the concurrence and dissent fails to follow basic rules of appellate review, and instead improperly concocts an argument for the defense that defendant himself did not see fit to raise and to which the Attorney General has not been given the opportunity to respond.

The concurrence and dissent unpersuasively tries to claim that in so doing, it does not run afoul of the principle of party presentation. (Conc. & dis. opn. of Smith, J., *post*, p. 6.) But unless we are reviewing a judgment pursuant to *People v. Wende* (1979) 25 Cal.3d 436, it is not our place, as neutral arbiters, to search out issues on behalf of a party. To do so outside the confines of *Wende* review or other limited contexts is not judicial review, it is partisan advocacy. And while we are not "hidebound by the precise arguments of counsel" (*United States v. Sineneng-Smith*, *supra*, 590 U.S. at p. ___ [140 S.Ct. 1575, 1581]), neither are we free to create new issues upon which to reverse while failing to afford the parties the opportunity to address them.

Since the evidence permitted the jury to reasonably conclude that the criminal street gang defendant sought to benefit included the perpetrators of the primary activities and predicate offenses (*Prunty*, *supra*, 62 Cal.4th at p. 76), it was sufficient to establish the existence of the requisite criminal street gang.

## II

### INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends he received ineffective assistance of counsel because, during closing argument, his trial attorney discussed the concept of reasonable doubt, but failed to relate that concept to the facts of the case or to discuss those facts with the jury. We conclude defendant has not shown cause for reversal.

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground in *People v.*

*Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

"The right to counsel guaranteed by the Sixth Amendment to the federal Constitution includes the right of counsel to make a closing argument in a criminal case. [Citation.]" (*People v. Diggs* (1986) 177 Cal.App.3d 958, 969, fn. omitted.) "Closing argument may be waived in an appropriate case as a matter of tactics. [Citations.] However, having chosen to make a closing argument, counsel cannot argue against his client. [Citations.] More particularly, unless his client consents, counsel cannot expressly or impliedly argue to the jury that his client is guilty. [Citations.]" (*Id.* at p. 970.)

23.

Defense counsel's closing argument at defendant's trial was, as defendant asserts, brief, covering approximately five pages of reporter's transcript. Counsel argued the concept of reasonable doubt in general, but was not factually specific. In so doing, however, he did not (contrary to defendant's assertion on appeal) argue against defendant or imply defendant was guilty.[8]

" 'The decision of how to argue to the jury after the presentation of evidence is inherently tactical' [citation], and there is a 'strong presumption' that counsel's actions were sound trial strategy under the circumstances prevailing at trial. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 856; see *People v. Cudjo* (1993) 6 Cal.4th 585, 634-635; *People v. Mayfield* (1993) 5 Cal.4th 142, 186.) "The mere fact that the issue could have been argued differently, or with a different emphasis or focus, does not establish ineffective assistance. [Citation.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 471; see *People v. Jennings* (1991) 53 Cal.3d 334, 379-380.)

"[T]he appellate record sheds no light on why trial counsel acted as he did; he was not asked to explain his performance; although we may doubt that a satisfactory explanation could be provided, we are unable to conclude that it could not." (*People v. Bell* (1989) 49 Cal.3d 502, 546.) Accordingly, defendant's claim is rejected on appeal.

---

[8] Citing *McCoy v. Louisiana* (2018) 584 U.S. ___ [138 S.Ct. 1500], defendant claims "[a] criminal defendant has a constitutional right to insist that his lawyer argue his innocence in closing argument." *McCoy* dealt with a situation in which, over the defendant's express objection, defense counsel conceded guilt after concluding the evidence was overwhelming and a concession afforded the defendant the best chance of avoiding a death sentence. (*Id*. at pp. ___-___ [138 S.Ct. at pp. 1505-1507].) The United States Supreme Court held that "[w]hen a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt. [Citations.]" (*Id*. at p. ___ [138 S.Ct. at p. 1509].) The record before us contains nothing to suggest *McCoy* is implicated.

# III

## SENTENCING ISSUES

Defendant was sentenced on January 25, 2018. The probation officer recommended imposition of concurrent terms of 27 years to life on counts 1 and 2, calculated as the upper seven-year term for each violation of section 246, plus 20 years for each firearm enhancement (§ 12022.53, subd. (c)), plus an indeterminate life term for each of the gang enhancements (§ 186.22, subd. (b)(4)(B)). The probation officer further recommended a stay of the section 12022.5 firearm enhancements.

At the sentencing hearing, the only subjects discussed were whether the aggravated terms should be imposed for the section 246 violations, and whether concurrent or consecutive sentences were appropriate. The court ultimately imposed two consecutive terms of 23 years to life. It also imposed a four-year term on each count pursuant to section 12022.5, but stayed those terms pursuant to section 12022.53, subdivision (f).[9]

## A.    The Firearm Enhancements

A firearm use enhancement may not be imposed pursuant to section 12022.5 where use of a firearm is an element of the underlying offense. (§ 12022.5, subd. (a).) This precludes application of such an enhancement to the crime proscribed by section 246. (*People v. Kramer* (2002) 29 Cal.4th 720, 723, fn. 2.) Accordingly, the Attorney General concedes the section 12022.5 enhancements imposed here must be stricken. We will order the judgment modified accordingly.

The Attorney General also agrees remand is appropriate to permit the trial court to exercise its discretion whether to strike the section 12022.53 enhancements.[10]

---

[9]    Section 12022.53, subdivision (f) prohibits imposition of an enhancement pursuant to section 12022.5 when an enhancement pursuant to section 12022.53 is imposed.

[10]    A violation of section 246 is not listed, in section 12022.53, subdivision (a), as one of the felonies to which section 12022.53 applies. Because defendant received a life term

Effective January 1, 2018, Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, § 2) gave trial courts previously unavailable discretion to strike or dismiss enhancements imposed pursuant to section 12022.53 "in the interest of justice pursuant to Section 1385 . . . ." (§ 12022.53, subd. (h).)[11] Defendant was sentenced after the effective date of the legislation, and a reviewing court generally presumes the trial court knew and applied the correct law in performing its duties. (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1456.) However, " '[d]efendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [the California Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

We agree with the parties that the record strongly suggests the court, counsel, and probation officer all were unaware of the change in the law.[12] There is no clear indication the trial court would have imposed either or both enhancements had it known it

on each count pursuant to section 186.22, subdivision (b)(4), however, he falls within section 12022.53, subdivision (a)(17), which makes section 12022.53 applicable to "[a]ny felony punishable by death or imprisonment in the state prison for life." (See *People v. Jones* (2009) 47 Cal.4th 566, 568-569.)

[11] The same discretion was granted with respect to enhancements imposed pursuant to section 12022.5. (§ 12022.5, subd. (c), as amended by Stats. 2017, ch. 682, § 1.)

[12] Defendant cites to a statement in the probation officer's report that section 12022.53 enhancements "cannot be stayed or stricken . . . ." This statement appeared in the original probation report. It was not repeated in the amended report that was signed as having been read and considered by the trial court. Nevertheless, the amended report implied the enhancements were mandatory.

was not required to do so.  Accordingly, we will remand the matter to give the court the opportunity to exercise its discretion with respect to the section 12022.53, subdivision (c) enhancements.[13]

**B.**    *Franklin*

Defendant, who was 19 years old at the time of the offenses, contends the matter should be remanded to afford him the opportunity to present evidence and information relevant to his eventual youth offender parole hearing, pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).  We disagree.

Generally speaking, a person who was sentenced to a lengthy prison term for an offense committed when he or she was age 25 or younger, is entitled to a youth offender parole hearing.  (§ 3051, subd. (a)(1).)  When assessing a prisoner's suitability for parole, the parole board is required to "give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner . . . ."  (§ 4801, subd. (c); see § 3051, subd. (f)(1).)

In *Franklin*, the California Supreme Court reasoned that the foregoing statutes "contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the [parole board's] consideration. . . .  Assembling . . . statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later . . . ."  (*Franklin*, *supra*, 63 Cal.4th at pp. 283-284.)[14]

---

**13**    We express no opinion as to how the trial court should exercise its discretion.  If, after remand, there is no change in sentence with respect to the enhancement imposed as to count 1, the abstract of judgment must be corrected to show that enhancement was imposed pursuant to section 12022.53, subdivision (c), not section 12022.55, subdivision (c) as the abstract currently states.

**14**    When first enacted, section 3051 applied to juveniles in the true sense of the word: offenders under age 18.  (Stats. 2013, ch. 312, § 4, eff. Jan. 1, 2014.)  The constitutional underpinnings of the statute, as discussed in *Graham v. Florida* (2010) 560 U.S. 48,

The state high court concluded that Franklin, who was 16 years old when he committed murder, and who was sentenced before the decisions in *Miller* and *Caballero* and before the enactment of sections 3051 and 4801 (*Franklin*, *supra*, 63 Cal.4th at p. 268), may not have had an adequate opportunity at sentencing "to make a record of mitigating evidence tied to his youth" (*id*. at p. 269). Accordingly, it remanded the matter not for resentencing, but to permit the trial court to determine "whether Franklin was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Id*. at p. 284.) If Franklin did not have sufficient opportunity, the trial court was empowered to receive pertinent evidence and information from both parties, with "[t]he goal of any such proceeding [being] to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the [parole board], years later, may properly discharge its obligation to 'give great weight to' youth-related factors [citation] in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law' [citation]." (*Ibid*.)

Although little, if any, information contemplated by *Franklin* was presented at sentencing, we conclude defendant is not entitled to a remand. *People v. Woods* (2018) 19 Cal.App.5th 1080 is on point:

> "Unlike the defendant in *Franklin*, defendant was 19 years old at the time of his offense and thus he was not subjected to a sentence that violated constitutional principles prohibiting a minor from being sentenced to the functional equivalent of life without parole without considering how minors are different from adults and how those differences counsel against

---

*Miller v. Alabama* (2012) 567 U.S. 460, and *People v. Caballero* (2012) 55 Cal.4th 262 (see *Franklin*, *supra*, 63 Cal.4th at p. 277), also distinguish between juveniles and adults. Our state Legislature has since expanded the scope of the statute, first to offenders under age 23 (Stats. 2015, ch. 471, § 1, eff. Jan. 1, 2016), and most recently to offenders age 25 or younger (Stats. 2017, ch. 675, § 1, eff. Jan. 1, 2018).

irrevocably sentencing a minor to a lifetime in prison. Moreover, unlike the defendant in *Franklin*, defendant was not sentenced at a time when youth offender parole hearings were not yet part of California law. . . . Thus, unlike the situation in *Franklin*, when defendant was sentenced in this case . . . section 3051 was already in place and had already been amended to encompass offenders like him . . . , and subdivision (c) of . . . section 4801 already identified the various factors to be considered at a youth offender parole hearing. Thus unlike the defendant in *Franklin*, defendant had both the opportunity and incentive to put information on the record related to a future youth offender parole hearing.

"Under these circumstances, there is no reasonable basis for concluding, as defendant argues, that defendant was denied a sufficient opportunity to put on the record the kinds of information that . . . sections 3051 and 4801, subdivision (c) deem relevant at a youth offender parole hearing." (*People v. Woods*, *supra*, 19 Cal.App.5th at pp. 1088-1089, italics added; accord, *People v. Medrano* (2019) 40 Cal.App.5th 961, 963; cf. *People v. Rodriguez* (2018) 4 Cal.5th 1123, 1131-1132; *In re Loza* (2018) 27 Cal.App.5th 797, 807; *People v. Jones* (2017) 7 Cal.App.5th 787, 819.)

Defendant says nothing in the record shows defense counsel realized he had the opportunity or duty to make a record of information relevant to defendant's eventual youth offender parole hearing. To the contrary, when the court and parties were setting a date for sentencing, the court asked whether defense counsel wanted a long probation report or a short probation report. Defense counsel requested a long report, as there were issues he wanted to brief regarding defendant's age and youth. The court agreed it would be helpful for him to have "all that social information." Thus, it appears a *Franklin*-type hearing was contemplated. Although defendant was represented by different counsel (albeit apparently from the same law office as trial counsel) at sentencing, nothing in the record suggests that attorney was unaware of *Franklin*.

Defendant says that since the matter is being remanded with respect to the firearm enhancements, we should additionally order the court to hold a *Franklin* hearing. We decline to place an extra burden on the trial court where defendant did not avail himself

29.

of the opportunity to make the pertinent record at sentencing and it is clear he would not have been prevented from doing so.

This does not preclude defendant from making a pertinent record, however.  In *In re Cook* (2019) 7 Cal.5th 439, 446-447, the California Supreme Court held that an offender whose conviction is final may file a motion in the trial court under section 1203.01 for the purpose of making a record to preserve evidence of youth-related factors. Accordingly, our rejection of defendant's *Franklin* claim is without prejudice to defendant "filing a motion in the trial court for a *Franklin* proceeding under the authority of section 1203.01" and *Cook*, *supra*, at page 460.  (See *People v. Medrano*, *supra*, 40 Cal.App.5th at p. 963.)

## DISPOSITION

The judgment is modified to strike the section 12022.5 enhancements.  As so modified, the judgment is affirmed.  The matter is remanded to the trial court with directions to exercise its discretion pursuant to section 12022.53, subdivision (h) and, if necessary following exercise of that discretion, to resentence defendant accordingly.  The trial court shall cause to be prepared an amended abstract of judgment reflecting the foregoing modification and any resentencing, and, if no resentencing occurs, showing the enhancement on count 1 was imposed pursuant to section 12022.53, subdivision (c), not section 12022.55, subdivision (c).  The trial court shall further cause a certified copy of the amended abstract of judgment to be transmitted to the appropriate authorities.

DETJEN, Acting P.J.

I CONCUR:


MEEHAN, J.

SMITH, J., Concurring and Dissenting.

Renteria was convicted of two counts of shooting at an inhabited dwelling. Gang enhancements attached to each count of conviction were found true.

I respectfully dissent from the majority's conclusion that the gang enhancement attached to each count of conviction was supported by sufficient evidence. I would reverse the gang enhancement as to each count as well as the 20-year Penal Code[1] section 12022.53, subdivision (c), firearm enhancements triggered once Renteria became subject to life terms pursuant to section 186.22, subdivision (b)(4)(A), as a consequence of the gang enhancement findings. Otherwise, I concur with the majority opinion.

## I.    Evidence was Insufficient to Support Gang Enhancements

Penal Code section 186.22, also known as the Street Terrorism and Prevention Act (the STEP Act), imposes various punishments on individuals who commit gang-related crimes. The gang enhancement codified in section 186.22, subdivision (b), applies to those who commit felonies "for the benefit of, at the direction of, or in association with any criminal street gang." A criminal street gang, in turn, is defined in section 186.22, subdivision (f), as any "ongoing organization, association, or group of three or more persons" that shares a common name or common identifying symbol; that has as one of its "primary activities" the commission of certain enumerated offenses; and "whose members individually or collectively" have committed or attempted to commit certain predicate offenses. "To prove that a criminal street gang exists in accordance with these statutory provisions, the prosecution must demonstrate that the gang satisfies the separate elements of the STEP Act's definition *and* that the defendant sought to benefit that particular gang when committing the underlying felony." (*People v. Prunty* (2015) 62 Cal.4th 59, 67 (*Prunty*), italics added.)

---

[1]    Undesignated statutory references are to the Penal Code.

Here, the prosecution sought to demonstrate that a county-level Sureño gang satisfied the separate elements of the STEP Act's definition of a criminal street gang and that Renteria sought to benefit that specific gang when committing the underlying shootings. The prosecution's evidence in these respects was deficient. The prosecution failed to satisfy all the elements of the STEP Act's definition of a criminal street gang, with reference to the Sureño gang. Specifically, there was insufficient evidence to support the "primary activities" element of the statutory definition of a criminal street gang. The prosecution adduced no direct evidence of the primary activities of the Sureño gang and the indirect evidence was insufficient. In addition, the prosecution failed to prove that, when committing the underlying shootings, Renteria acted to benefit the county-level Sureño gang, as opposed to the South Side Kings, a Sureño subset of which he was a member. Finally, the prosecution's evidence indicated that the county-level Sureño gang operated through a collection of subsets and the prosecution's theory of the existence of the county-level Sureño gang necessarily turned on the conduct of its subsets, but the prosecution failed to show that the subsets were united by "an associational or organizational connection." (*Prunty*, *supra*, 62 Cal.4th at p. 67.) Therefore, the gang enhancements should be reversed for insufficiency of the evidence.

### A. Insufficient Evidence of Primary Activities Element of Street Gang Definition

The prosecution introduced expert testimony from its gang expert regarding the county-level Sureño gang. The gang expert indicated the county-level Sureño gang was geographically dispersed and operated through subsets such as the South Side Kings, SUR Town Locos, Loco Park, Wicked Ass Sureños, and South Side Winos. The gang expert further indicated the county-level Sureño gang was large, with no less than 500 members.[2]

---

[2] The gang expert indicated the Sureño gang operated county-wide, which would include the various metropolitan and rural areas of Tulare County. Renteria's crimes

2

The expert described three predicate offenses that he had personally investigated in the city of Tulare and that he attributed to Sureño gang members.[3]  However, the expert offered no testimony about the primary activities of the county-level Sureño gang.

The majority asserts, without discussion, that the gang expert's testimony regarding three predicate offenses also established the primary activities of the county-level Sureño gang.  (Maj. opn. *ante*, at pp. 10-11.)  On the instant record, I disagree with this assertion.

The prosecutor asked the prosecution's gang expert, Tulare Police Officer Jacob Adney, to give examples of crimes committed on behalf of the Sureño gang, in order to show that the Sureño gang engaged in a pattern of criminal activity.  Adney described three predicate offenses.  Adney testified that, on April 10, 2014, four people were in a car, all four were Sureño gang members.  One of them, Francisco Cortez, was found in possession of "a .380[-]caliber firearm" and was subsequently convicted of criminal possession of a firearm (felon in possession) under section 29800.  Adney next testified that on June 12, 2014, a "loaded stolen firearm" was found in a "vehicle occupied by" Fabio Delreal, a Sureño gang member, who was subsequently convicted of criminal possession of a firearm (felon in possession) under section 29800.  Finally, Adney testified that on February 4, 2009, shots were fired, from a passing car, at a car pulling out of a driveway.  The suspect vehicle was located three days later, with two firearms in it.  Armando Flores, a Sureño gang member who was in the car, was convicted of criminal possession of a firearm.  Another person who was in the car, Daniel Villa Gomez, was convicted of a separate offense, "shooting [at a vehicle]" under section 246.

_____

occurred in the city of Tulare.  In addition to the city of Tulare, Tulare County contains the metropolitan areas of Visalia and Porterville, along with numerous smaller communities.

[3]	The jury was instructed that the predicate offenses included shooting at an occupied motor vehicle and two types of firearm possession offenses.

3

Adney did not identify the subsets of the perpetrators of the predicate offenses. He also did not testify about the primary activities of the Sureño gang in Tulare County or any of its constituent subsets, including the South Side Kings (of which Renteria was a member).

In assessing the nature of the gang's primary activities, the trier of fact may look to both the past and present criminal activities of the gang. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) Isolated criminal conduct, however, is not enough. "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) "Also sufficient might be expert testimony" based on an adequate factual foundation. (*Ibid.*)

Predicate offenses may constitute, depending on the context and record, evidence of the primary activities of the gang in question. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323 [evidence that gang members committed predicate offenses alone can be, but is "[n]ot necessarily," sufficient to prove the gang's primary activities].) Here, the People adduced proof of three incidents involving crimes by Sureño members: two incidents from 2014 and one from 2009. Firearm possession offenses by Cortez and Delreal in 2014, and, *five years earlier*, in 2009, a firearm possession offense by Flores and an offense of shooting at an occupied vehicle by Gomez, is insufficient to show that the commission of these crimes was a primary activity of the county-level Sureño gang. This evidence merely showed that members of the 500-strong, county-wide Sureño gang had committed a few crimes over the last five years. (See *Ibid.* [a gang's primary activities, by definition, "exclude the occasional commission of [qualifying] crimes by the group's members"].)

The county-level Sureño gang at issue was a relatively complex entity—it had at least 500 members and operated county-wide through multiple subsets. Without further evidence regarding the activities of the gang, there was insufficient evidence for the jury

4

to conclude that commission of the specific offenses at issue (i.e., illegal firearm possession and shooting at an occupied vehicle) constituted "one of the group's 'chief' or 'principal' occupations."[4] (*Sengpadychith*, *supra*, 26 Cal. 4th at p. 323.)

In my view, given the instant record, the People did not adduce sufficient evidence of the primary activities of the county-level Sureño gang, and, in turn, failed to prove that the county-level Sureño constituted a criminal street gang for purposes of the gang enhancement statute.[5] Accordingly, I would reverse the gang enhancement that was applied to each count of conviction.

The majority notes that, "[a]s part of proof of the gang enhancement, the prosecution must prove the existence of a criminal street gang." (Maj. opn. *ante*, at p. 17.) Further, the majority explicitly takes the position that, here, the "predicate acts were committed by Sureños" and "the primary activities of the Sureño criminal street gang in Tulare County were those committed as the predicate acts." (Maj. opn. *ante*, at p. 21.) However, when it is suggested their position—that the predicate acts sufficed to establish

---

[4]     The jury was instructed, in relevant part, that a criminal street gang was a group that had "as one or more of its primary activities, the commission of shooting at [an] occupied motor vehicle (PC 246), carrying a loaded firearm-not registered (PC 12031(a)(1)), or felon in possession of a firearm (PC 29800(a)(1))." The jury was further instructed:  "In order to qualify as a *primary activity*, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group."

[5]     "[T]he 'criminal street gang' component of a gang enhancement requires proof of three essential elements:  (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.'" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222, overruled on other grounds by *People v. Sanchez* (2016) 63 Cal.4th 665, as recognized in *In re Thomas* (2018) 30 Cal.App.5th 744, 752-753; see *In re Alexander L.* (2007) 149 Cal.App.4th 605, 610-611.)

5

the primary activities of the Sureño gang—is incorrect, the majority in turn asserts we are precluded from addressing the primary activities element of the gang enhancement.

Here, the primary issue Renteria raises on appeal is a challenge to the sufficiency of the evidence supporting the imposition of the gang enhancements. This issue requires us to review the entire record to ascertain whether sufficient evidence supports the gang enhancements. The deficiency in the evidence with respect to the "primary activities" element of the gang enhancements is readily apparent on the face of the record. Under these circumstances, we are duty bound to address it. (See, e.g., *United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc*. (1993) 508 U.S. 439, 447 [holding that "a court may consider an issue 'antecedent to … and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief," quoting *Arcadia v. Ohio Power Co*. (1990) 498 U.S. 73, 77; *United States v. Tutty* (2d. Cir. 2010) 612 F.3d 128, 131 [courts of review may consider unraised issues when justice so requires].) Indeed, although the parties' briefing may be inartful, the question of primary activities is part and parcel of the issue of the sufficiency of the evidence supporting the gang enhancements and underpins the majority's own analysis.

Nonetheless, the majority declares we are not "free to create new issues upon which to reverse while failing to afford the parties the opportunity to address them." (Maj. opn. *ante*, at p. 22.) The "primary activities" issue is not cut from whole cloth as the majority suggests, and the parties were specifically given an opportunity, pursuant to an issue letter from this court, to address the issue of the prosecution's proof of the existence of a criminal street gang under *Prunty*, *supra*, 62 Cal.4th 59. The majority, however, takes issue with the "heading" under which I have addressed the question of the insufficiency of the evidence supporting the primary activities element. (Maj. opn. *ante*, at p. 22.)

Finally, the majority contends that addressing the sufficiency of the evidence to support the primary activities element would contravene "the principle of party

6

presentation" as explicated in *United States v. Sineneng-Smith* (2020) 140 S.Ct. 1575 (*Sineneng-Smith*). The majority's reliance on *Sineneng-Smith* is perplexing as the scenario addressed in that case bears no resemblance to the instant matter.

In *Sineneng-Smith*, the federal high court faulted the Ninth Circuit's handling of the case. The Ninth Circuit, following oral argument in the case, declined to hear the party-presented controversy, and instead sua sponte named three amici and invited them to advance issues framed by the panel (including a question appellant herself never raised and which cut against the appellant's theory at trial), and held a second oral argument at which the amici were given greater roles than the parties themselves. (*Sineneng-Smith*, *supra*, 140 S.Ct. at pp. at 1578, 1580-1581.) The high court determined these drastic steps contravened the party presentation principle as the case ended up being "radical[ly] transform[ed]." (*Id*. at pp. 1578-1579, 1582.) At the same time, the high court made clear that the "party presentation principle is supple, not ironclad," and specifically noted that "[t]here are no doubt circumstances in which a modest initiating role for a court is appropriate." (*Id.* at p. 1579.) Furthermore, *Sineneng-Smith* reinforced the general principle that "a court is not hidebound by the precise arguments of counsel." (*Id*. at p. 1581.) The majority's reliance on *Sineneng-Smith*, where the Ninth Circuit sidelined the parties and solicited arguments from strangers to the litigation, is unavailing.

### B. Evidence was Insufficient to Show Renteria Acted to Benefit County-Level Sureño Gang

As the majority notes, the prosecution's theory was that the gang Renteria acted to benefit was a county-level Sureño gang. (Maj. opn. *ante*, at pp. 12, 15.) However, the prosecution's gang expert opined that Renteria was a member of the South Side Kings, a subset of a county-level Sureño gang, *and* of the county-level Sureño gang as well. Here, assuming there was sufficient evidence to show that Renteria acted to benefit a gang, the evidence was insufficient to show that the gang he acted to benefit was the county-level Sureño gang as opposed to his own subset, the South Side Kings.

7

The evidence that Renteria was a member of South Side Kings and the Sureño gang did not automatically clarify which of these two gangs he sought to benefit when he committed the shootings. Accordingly, the prosecution presented other evidence to support its theory that Renteria sought to benefit the Sureño gang when he committed the instant shootings. Specifically, the prosecution presented evidence of an incident involving Renteria and a group of unknown boys that occurred at some point before the shootings took place (some unidentified boys in the group had shouted a Sureño slur). The prosecution also presented the opinion of its gang expert that the shootings were committed to benefit the county-level Sureño gang.

However, this evidence was insufficient to show Renteria sought to benefit the county-level Sureño gang. First, the prosecution failed to show that the earlier incident, in which some unknown and unidentified boys had shouted a Sureño slur, was connected to the shootings. As for the gang expert's testimony that the gang Renteria acted to benefit was the Sureño gang, that opinion was based largely on the evidence of the earlier incident. More importantly, the gang expert's opinion was elicited in response to a hypothetical question posed by the prosecutor, but the hypothetical question misstated the relevant facts, thereby eviscerating the evidentiary value of the expert's opinion. I will explain below why the evidence regarding the earlier incident was insufficient to connect it to the shootings, as well as why the hypothetical question underlying the gang expert's opinion that the gang Renteria acted to benefit was the county-level Sureño gang, was improper.

### (i)     Earlier Incident Involving Group of Boys

The earlier incident was witnessed and described by Anthony A., who subsequently also saw Renteria shoot at the two houses. Renteria lived only a few houses away from Anthony's house and from the houses at which the shots were directed. The earlier incident took place sometime before the charged shootings, which occurred shortly before midnight, on August 8, 2014. There is no evidence in the record as to the

8

time of the earlier incident or of a tight temporal connection between the earlier incident and the subsequent shootings at midnight.[6]

Regarding the prior incident, Anthony testified that a group of five or six boys, one of whom was Renteria, had walked past his house. "[S]ome" in the group were shouting things, including "slang gang words" like "SUR, trece." Anthony was familiar with Renteria, who lived nearby and always interacted respectfully with Anthony and Anthony's wife. Anthony asked Renteria what the boys were up to and Renteria explained some were drunk, and everyone was going home. The boys continued across an open field next to Anthony's house. Anthony noted it was common for people to cut through the field. Renteria's explanation that some of the boys were drunk (presumably those who were shouting things) and were being helped home, was uncontradicted. Anthony went back into his house after talking to Renteria, who lived immediately north of the open field.

A little while later, Anthony heard a sound like a "pop" in the field. Anthony was not asked and did not further specify how much time had passed between the prior incident involving the group of boys and the time he heard the pop in the field. Anthony came back outside. He turned his front porch light off and sat on the porch in the dark. He saw Renteria and an unidentified person emerge from the field area.[7] The two walked down a side street (Denair); two minutes later the two walked back up that same side street. Upon their return, Renteria first shot at one house (near Anthony's house) and

---

[6]    The prosecutor asked Anthony: "All right. About what time was this shooting?" Anthony responded: "I don't really recall the time. I know it was pretty late 'cause it was really dark at that time so it was probably maybe 10:00, 10:30." Later Anthony repeated that it was "dark" when the shootings occurred. Anthony's estimation of the time the shootings occurred was somewhat incorrect. The shootings occurred around 11:50 p.m., as reflected in police dispatch times.

[7]    Anthony "only recognized one" of the two, namely Renteria.

9

then, after dogs barked at the neighboring house, Renteria shot at the latter house as well. Renteria and his unidentified companion then ran away.

Here, the People did not show the earlier incident involving the group of five or six boys (some of whom were evidently drunk and were shouting gang slurs) was connected to the shootings. There was no evidence, for example, that the earlier incident occurred immediately before the shootings, such that the jury properly could infer the two incidents were temporally connected. Indeed, Anthony clarified that the incident with the group of boys, during which he spoke to Renteria, did *not* occur at the time of the shootings.[8] In addition, there was no evidence that Renteria or his companion during the shooting had shouted a gang slur during the prior incident. Indeed, there was no evidence that Renteria's companion during the shootings was even *present* during the earlier incident and part of the group of boys involved there. Aside from Renteria, the record contains no information about any of the boys in the larger group. Similarly, the record is silent as to the person who was with Renteria when Renteria shot the houses.

### (ii) Gang Expert's Opinion was Based on Improper Hypothetical

The prosecution called Tulare Police Officer Jacob Adney as its gang expert. Adney testified that a Sureño gang existed at the county level in Tulare county. His testimony indicated the Sureño gang was not local to the city of Tulare, where Renteria lived and the instant shootings occurred, but operated throughout the county.

---

[8]     As noted above, Anthony testified that first the group of boys went by his house; that was when he spoke to Renteria. A little while later, after he heard the pop sound in the field, Anthony came back outside and saw Renteria and another figure go south on Denair, before they returned, and Renteria committed the shootings. Anthony was shown the photographic line-up in which he had identified Renteria. Anthony was asked: "And so you talked to the same person that's depicted in that photograph [who] was one of those two people that came and passed by your house the second time?" Anthony responded: "Yes." Anthony was asked a followup question: "Okay. Now, that's not the time of the shooting; correct?" Anthony replied: "No." Anthony thus clarified that the time he talked to Renteria and the time of the shooting were separate, not contemporaneous, events.

Accordingly, it was a large gang, with "no less than 500" members, collectively. The expert testified that the Sureño gang operated through subsets and named multiple subsets that comprised the gang (e.g., South Side Kings (SSK), SUR Town Locos, Loco Park, Wicked Ass Sureños, South Side Winos).

Adney testified that Renteria was a member of the South Side Kings subset of the county-level Sureño gang and of the Sureño gang. Adney's conclusion that Renteria was part of these gangs was based in part on an incident from June 2011. Renteria and another person were found at a vacant residence that had been tagged with blue gang graffiti; the person with Renteria was holding a can of spray paint. The graffiti consisted, among other things, of the letters, "SSK," on the interior and exterior of the residence. Adney testified that the person with Renteria was "a part of the Sureño gang, and he's also a part of the same subset that Cristian Renteria is a part of[,] which is the South Side Kings."

When Adney interrogated Renteria after Renteria was arrested on August 13, 2014, for the instant offense, Renteria acknowledged that he was a member of the South Side Kings and the Sureño gang. Renteria was asked, "You're a southerner?" He answered, "Yeah." He was asked, as a follow-up, "What are you?" He replied, "Kings." In closing argument, the prosecutor referred to Renteria's interrogation: "You also have the defendant's admission after his arrest in the video interview when he first tries to deny it, but then when Detective Adney says come on, let's be real, he says okay, yeah, I'm a Southerner, I'm with the Kings."

Adney described the colors and symbols associated with the Sureño gang as well as with its subsets. Adney testified that gang members sometimes uttered a gang "slur" during the commission of a crime, to draw attention to the crime. Specifically, he said: "If you're committing a crime, and you're yelling out a gang slur, something about your gang, you know, whether it's King, South Side, SUR or trece, whatever it is, what that is is sending a message letting [people] know who's responsible for this." Adney noted the

11

word "Sureño" meant "Southerner." He further explained that the Sureño gang identified with "[t]he color blue" and "the [n]umber 13." Adney said the word "SUR" was "Spanish for south" and the word "trece" was "Spanish for 13." Adney also noted that the Sureño gang's rivals were the Norteño gang. As for the subsets of the county-level Sureño gang, Adney testified that all the subsets of that gang similarly identified with the color blue and the number 13, and harbored an enmity with the Norteño gang.

Finally, the prosecutor presented a hypothetical question to Adney, in which he asked Adney to assume certain facts, to elicit his opinions regarding the instant shootings. The relevance of the hypothetical scenario, and of Adney's testimony about it, depended on the extent to which the facts of the hypothetical matched the facts in evidence. However, the hypothetical scenario posited by the prosecutor misstated and deviated from the facts in evidence, thereby eviscerating the evidentiary value of Adney's testimony related to the hypothetical.

The prosecutor posed the following hypothetical question:

"Assume that a witness observes several individuals near his house later at night. He hears one or more of them calling out SUR trece. He continues to watch for a few minutes, and one of them comes back, produces a firearm and shoots at two houses.

"The first house is a residence known to be associated with Norteño gang activity. The second house is shot at after the dogs on that property start barking.

"Assume that a sawed-off shotgun is seen in the garage of the first house.

"Assume that this happens in an area that is claimed by both Norteño and Sureño gangs as their territory.

"Assume that the shooter is a member of the Sureño gang and that earlier that same night, he was hit up by some individuals while he was walking home, and he believes that Norteño gang members pulled a gun on him.

12

"In your opinion, would the shooting committed under those circumstances be committed … at the direction of, for the benefit of or in association with a criminal street gang with a specific intent to promote, further or assist in criminal conduct by gang members?"

Defense counsel objected on grounds the question "contain[ed] assumptions that have not been presented at trial." The trial court sustained the objection in part. The court agreed the hypothetical was inaccurate to the extent it represented the first house that was shot at as associated with Norteño gang activity and this portion of the hypothetical was dropped.[9] The hypothetical deviated from the evidence in other critical

---

[9] Although not relevant for the purposes of the present discussion, it appears the trial court correctly ruled there was no competent evidence linking Jack D.'s house with Norteño gang members at the time of the shootings. Adney had unsuccessfully attempted to show a connection between Jack D.'s house and Norteños. Adney described his contacts with a person called Robert P., Jr. Adney testified he had spoken to Robert P., Jr. on three occasions: once "in the area of Cross and H Street," another time in front of Jack D.'s house on Merritt Avenue, and a third time at "Coelho and Cross." Adney added that when he saw Robert P., Jr. at "Coelho and Cross," a known Norteño was at the scene. However, Adney could not specify when these contacts with Robert P., Jr. occurred, and did not explain, regarding the instance when he saw Robert P., Jr. in front of Jack D.'s house, what Robert P., Jr. was doing there. Significantly, Adney did not testify that Robert P., Jr. was a Norteño. Rather, Adney simply indicated that, at some unspecified point in time, he had seen Robert P., Jr., at a random location, where a known Norteño was present, and at another unspecified time, had seen Robert P., Jr. in front of Jack D.'s house. Adney's vague and attenuated testimony did not constitute competent evidence of a link between Jack D.'s house and Norteños.

The majority points to evidence that one of the officers who responded to the scene of the shootings, noticed a sawed-off shotgun in Jack D.'s garage. (Maj. opn. *ante*, at p. 5.) There is no further information in the record about the sawed-off shotgun spotted in the garage by the officer. More specifically, there is no evidence the weapon in question was a functional shotgun; nor did the officer investigate to whom the weapon belonged and why it was there. Based on the officer's discovery, Renteria was interrogated as to whether he was threatened with a shotgun when he was hit up earlier in day, on the day the shootings occurred. Renteria denied he saw any gun when he was hit up, noting he only heard a "shoo shoo" sound like a shotgun during the encounter and ran away. The officer's bare testimony that he happened to see a sawed-off shotgun in Jack D.'s garage does not support an inference that Jack D.'s house was associated with Norteños.

13

respects as well. As relevant here, the hypothetical did not match the events surrounding the shootings as described by Anthony, the only eyewitness to those events.

In the hypothetical, the prosecutor stated: "Assume that a witness observes several individuals near his house later at night. He hears one or more of them calling out SUR trece. *He continues to watch for a few minutes*, and one of them comes back, produces a firearm and shoots at two houses." (Italics added.) However, as explained above, while Anthony noted he saw the group of boys a little while before the shootings occurred, he did not clarify how much time elapsed between the time he saw the boys and the time of the shootings. He confirmed, moreover, that the two incidents did not occur at the same time. Anthony also testified that following the incident with the group of boys, he went back inside his house. He only emerged later, after he heard a "pop" sound in the open field. It was then that he saw two people, one of whom was Renteria, walking down Denair, and sat down on his dark porch to see whether they would return. They returned two minutes later, whereupon Renteria shot at the houses.[10]

In giving his opinion as to whether the shootings benefitted the Sureño gang, Adney went much further than the hypothetical and assumed that *the shooter* shouted SUR trece *when* he committed the shootings, and, based on that assumption, opined that the shootings benefitted the Sureño gang. Specifically, he stated: "So when a Sureño gang member goes and does a shooting, it's showing that he's willing to put in work for the gang. He's willing to show that he's violent. He's not going to be a coward, and *by saying the word SUR trece **while** they're committing this act*, this is for everybody to know who's responsible for this shooting. [¶] … [¶] And *so not only is the subject*

---

Finally, Jack. D. testified that none of the people living at his house had any gang connection.

**10** The hypothetical deviated from the facts in evidence in yet another respect. Although Renteria acknowledged during his interrogation that he was hit up earlier that day by potential Norteños, he did not say the hit up occurred when he was walking home or that it occurred by his home.

14

*committing the act*, not only is he showing that he's violent, *but because he's saying these words* and because he's a part of a much larger gang, it's enhancing the reputation of the whole gang as a whole." (Italics and bold added.)

Defense counsel again objected: "Your Honor, I'd like to make an objection. The statement is nonresponsive to the hypothetical and also misstates the evidence in the answer. [¶] According to the hypothetical, the word SUR trece was said earlier in the evening, not during the commission of the offense, and there was no evidence as to who said that statement." The prosecutor contended that SUR trece was said minutes before the shooting. The court overruled the objection.

The hypothetical, and use of it, were improper. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1046 (*Vang*) [a hypothetical question posed to an expert must "assume facts within the limits of the evidence, not unfairly assembled"]; *People v. Boyette* (2002) 29 Cal.4th 381, 449 [while " 'an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth," ' " "a party cannot use this method of questioning a witness to place before the jury facts divorced from the actual evidence and for which no evidence is ever introduced"]; *People v. Franklin* (2016) 248 Cal.App.4th 938, 949 ["While an expert may render an opinion assuming the truth of facts set forth in a hypothetical question, the 'hypothetical question must be rooted in facts shown by the evidence.'"]; *People v. Richardson* (2008) 43 Cal.4th 959, 1008 [an "expert's opinion may not be based 'on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors.' "].) Consequently, the expert's testimony and opinions based on the facts assumed to be true in the hypothetical had no evidentiary value. In other words, the gang expert's opinion that Renteria acted to benefit the Sureño gang was of no evidentiary significance. (See *Vang*, *supra*, 52 Cal.4th at p. 1046 ["A hypothetical question not based on the evidence is irrelevant and of no help to the jury."]; *People v. Gardeley* (1996) 14 Cal.4th 605, 618

15

["'Like a house built on sand, the expert's opinion is no better than the facts on which it is based.'"], overruled on other grounds by *People v. Sanchez*, *supra*, 63 Cal.4th 665.)

The prosecutor similarly mischaracterized the evidence, if mistakenly, during his closing argument. In his closing argument the prosecutor highlighted the earlier incident involving the group of boys, characterizing it as having occurred "minutes" before the shootings, to draw a connection between Renteria and the Sureño gang. The prosecutor specifically observed that some boys had shouted "SUR trece" "minutes" before the shooting, to suggest that Renteria shot the houses to benefit, or in association with, the Sureño gang.[11] Not only did the evidence not show that the earlier incident occurred "minutes" before the shootings, but the record did not disclose substantial evidence to connect the earlier incident to the shootings.

Indeed, in testifying about gangs generally, Adney testified that a gang slur shouted *during* the commission of a crime serves to connect the crime to the relevant gang. Adney's opinion testimony reiterated this principle, as he opined, "by saying the word SUR trece *while* they're committing this act, this is for everybody to know who's responsible for this shooting." (Italics added.) However, here Anthony confirmed that the slurs were not shouted at the same time as the shootings. Furthermore, there was no evidence the slurs were shouted within a tight window of time in relation to the shootings, such that the shouting of the slurs could rationally be connected to the shootings. (Cf. *Prunty*, *supra*, 62 Cal.4th at p. 67 [the defendant in *Prunty*, who identified as a Norteño and claimed membership in a particular Norteño subset, had "uttered gang slurs and invoked 'Norte' *when* shooting a perceived rival gang member," italics added].)

---

[11]     In contrast to Anthony's trial testimony, the prosecutor also argued, if mistakenly, that Anthony did not go back inside his house after speaking to Renteria during the incident involving the group of boys, but "decided to wait outside" his house.

16

### (iii) Conclusion: Evidence was Insufficient to Show Renteria Acted to Benefit Sureño Gang

Here, the evidence was that Renteria was a member of the South Side Kings subset, which, along with other evidence, showed he was also a member of a larger, county-level Sureño gang. However, the hypothetical presented to the gang expert omitted any reference to the fact that Renteria was a member of the South Side Kings; rather, the gang expert was asked to assume that Renteria was simply a Sureño. More importantly, as discussed above, the hypothetical distorted the record in assuming that the earlier incident in which someone shouted SUR trece, a Sureño slur, was essentially contemporaneous with the shootings. Since Adney's opinion that the gang Renteria acted to benefit was the Sureño gang was tied to the prosecutor's improper hypothetical question (and encompassed additional, incorrect assumptions beyond those included in the hypothetical), it was ultimately irrelevant and of no help to the jury, if not prejudicial.

In light of this record, I conclude that the evidence was insufficient to support a conclusion, beyond a reasonable doubt, that the gang that Renteria acted to benefit was the county-level Sureño gang. Therefore, even assuming the prosecution proved the county-level Sureño gang existed as a criminal street gang with respect to predicate offenses and primary activities, there was insufficient evidence to prove that the gang Renteria acted to benefit was this specific gang, rather than his own subset, the South Side Kings. In turn, there was insufficient evidence to support the gang enhancements attached to the counts of conviction.

### C. Insufficient Evidence to Show Constituent Subsets of County-Level Sureño Gang Were United by an Associational or Organizational Connection

As discussed above, the prosecution's theory was that Renteria committed the shootings to benefit the Sureño gang. The prosecution also posited that the Sureño gang existed as a criminal street gang as defined in section 186.22, subdivision (f). Officer Adney, the prosecution's gang expert, testified that the Sureño gang existed at the county level, was a large gang with "no less than 500 members," and operated through subsets,

17

such as the South Side Kings, SUR Town Locos, Loco Park, Wicked Ass Sureños, South Side Winos. The expert further testified, by answering a series of questions in the affirmative, that the subsets worked together, shared information, shared weapons, and operated as a single entity. He also affirmatively answered a question as to whether he had personally investigated cases where different subsets had worked as a single organization to commit crimes.[12]

The expert's testimony posited a county-level structure where a collection of subsets, totaling 500 members, collectively operated as the Sureño gang, or, stated differently, where the various subsets of the Sureño gang, totaling 500 members, worked together to give effect to the gang's criminal objectives. In turn, the prosecution's theory regarding the existence of a criminal street gang turned on the existence and conduct of these subsets.

However, when it came to evidence of predicate offenses, the gang expert described predicate offenses as offenses committed by Sureño gang members, without identifying the subsets to which these gang members belonged and without providing substantive evidence to establish the subsets were in fact united by means of associational or organizational connections into one gang. (See *Prunty*, *supra*, 62 Cal.4th at p. 71 ["where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22[, subd.] (f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets"].) The gang expert's monosyllabic, affirmative answers to questions about the organizational connections binding the different subsets into one county-level Sureño gang did not count, as this testimony was purely

---

[12]    Adney provided no details or facts regarding any case he had personally investigated in this regard, only a bare, affirmative response to the question.

conclusory. (See *Prunty*, *supra*, at pp. 84-85 [gang expert's "purely conclusory" testimony is "essentially of no use to the fact finder"].)

The majority contends, as do the People, that *Prunty* did not apply as the People posited the existence of a larger Sureño gang and, therefore, the People's theory of the existence of a criminal street gang did not really turn on subsets at all. (Maj. opn. *ante*, at pp. 20-22.) The majority's rationale glosses over the gang expert's testimony that the Sureño gang operated through subsets, totaling 500 members county-wide.[13] *In People v. Nicholes* (2016) 246 Cal.App.4th 836 (*Nicholes*), the court rejected the argument advanced by the majority, finding it to be "at odds with our Supreme Court's statement that that it 'granted review in [*Prunty*] to address the showing prosecutors must make when attempting to show that "multiple subsets of the Norteños may be treated as a whole" under section 186.22[, subdivision] (f).'" (*Id.* at p. 845, quoting *Prunty*, *supra*, 62 Cal.4th at p. 71, fn. 2.)

Given Adney's testimony that the county-level Sureño gang operated through subsets, the prosecution was required to show some connection between the Sureño gang and its subsets, or among some of the subsets, beyond the conclusory testimony offered by Adney. (See *Prunty*, *supra*, 62 Cal.4th 59 ["the STEP Act requires the prosecution to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang"].) While Adney testified that historically there was some indication of consolidation among some subsets of the Sureño gang, there was no evidence of any "ongoing" connection, formal or informal, uniting any of the subsets. (See *Id.* at p. 83 [there must be evidence of an "ongoing relationship" between

---

**13** *Prunty* clarified that "the [STEP] Act requires that the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22[, subdivision] (f), must be one and the same." (*Prunty*, *supra*, 62 Cal.4th at pp 75-76.)

the putative members of group posited by the prosecution].)  Adney also indicated that he had personally investigated instances where different subsets had worked together to commit crimes, but his testimony to this effect was merely in the form of a "[y]es" response to a question on the point.  Adney provided no details or facts to enable the jury to assess the nature or quality of the interaction between the subsets.

At a minimum, the prosecution should have identified the subsets that committed the predicate offenses and showed some connection between them, or between them and the Sureño gang.  (See *Nicholes*, *supra*, 246 Cal.App.4th at p. 848 ["At a minimum, *Prunty* requires that the prosecution, in a case involving Norteños and testimony that Norteños operate through subsets, introduce evidence specific to the subsets at issue."].)  In sum, given the total dearth of any substantive evidence regarding the relationship between the Sureño gang and its subsets, the evidence supporting the gang enhancements was insufficient under *Prunty*.  (See *Nicholes*, *supra*, at p. 848 [reversing for insufficient evidence "where the gang expert did no more than characterize the relevant individuals as Norteños, explain that Norteños are associated with the Nuestra Familia prison gang, and give general testimony not linked to the particular subsets involved in this case"].)

In this case, the evidence of subsets served as the fibers with which the fabric of the prosecution's proof of the existence of the Sureño gang was woven.  Without some type of competent evidence that would *permit an inference* that the Sureño gang's subsets were united by an associational or organizational connection into a single gang, the evidence was insufficient to support the gang enhancements attached to the counts of conviction.  (See *Prunty*, *supra*, 62 Cal.4th at p. 74 ["Some organizational or associational connection, whether formal or informal, must exist among subsets of a 'criminal street gang.'"].)

### D. Conclusion

Here, the evidence was insufficient to establish the county-level Sureño gang's primary activities, to show that Renteria acted to benefit the Sureño gang rather than his

20

own subset, and to show that the relevant subsets of the Sureño gang were united by some kind of associational or organizational connection, formal or informal.  I conclude the evidence was insufficient to support the gang enhancements attached to the counts of conviction.  I would therefore reverse the gang enhancements and the section 12022.53, subdivision (c) firearm enhancements that were triggered once Renteria became subject to life terms pursuant to section 186.22, subdivision (b)(4)(A), as a consequence of the gang enhancement findings.

SMITH, J.

21